## Franks v. Smith.

(Decided February 14, 1911.)

### Appeal from Caldwell Circuit Court.

1. Militia of the State—Power of Governor to Order Into Active Service.—The Governor of the State has the authority to order into active service the militia of the State at any time or place that he deems their presence necessary. He need not wait before ordering them out to be requested so to do by the local civil authorities.

2. Militia—Power of the Governor to Direct Operations.—When the militia are ordered out, the Governor may direct and control their movements through military channels independent of the local civil authorities, or he may, if he chooses, direct the militia to report to any local civil officer and receive directions from him

3. Decision of the Governor not reviewable.—There is no limitation upon the power of the Governor to order into active service the militia or to direct into what locality they shall go or operate. He is to be the judge of the necessity for military intervention, and the courts have no authority to interfere with his action. The fact that this power may be abused is not sufficient to deny the granting of it.

4. Duty of the Governor to Preserve Peace and Quiet and see That the Law is Executed.—The Governor is charged by the Constitution and law with the duty of preserving the peace and quiet of the State, and to protect the life and property of its citizens; and to accomplish this end may use all the military forces of the State.

5. Governor acts as a Civil Officer.—In ordering out and controlling the military, and not in his capacity as commander-in-chief of the army of the State.

6. Military Subordinate to Civil Authority.—The military cannot in in any state of case take the initiative or assume to do anything independent of the civil authorities; and it must be at all times subordinate to the civil apthorities.

7. Liability of Soldier for Violation of Law.—A soldier, like a civilian, is liable to suit and prosecution in the civil and criminal courts of the State the same as any other citizen if he violates any of the laws of the State; and the fact that he does so in obedience to the orders of his superiors, will not furnish him any protection

8. Soldiers Have Powers of Peace Officers.—A soldier in active service, whether acting under the orders of his superior officer or some civil officer of the State, has the same power as a policeman or sheriff to make arrests, disperse disorderly gatherings and preserve the public peace.

9. A Soldier's Disobedience to Military Orders.—If a soldier is ordered by his superior officer to do an unlawful act, that is an act that a peace officer might not do, he must take the risk of refusing to obey the command or subject himself to suit or prosecution in the civil courts if he does.

10. Peace Officers—Powers Of.—The militia, acting as peace officers, have the right to arrest any person who has committed a felony, or is committing in their presence an act that constitutes a public offense, and the right to disperse, control and suppress riots or unlawful assemblies or bodies of men acting in concert for the purpose of, or that will have the effect of, intimidating, threatening, alarming, disturbing or injuring any person or molesting or destroying any property, with all the force and power necessary to accomplish these ends.

JAMES BREATHITT, Attorney General, JOHN F. LOCKETT, Assistant Attorney General, and JOHN GATES for the appellant.

R. W. LISANBY for the appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

The questions presented by this record relate to the power of the Governor to order into active service the militia of the State, and the civil rights and liabilities of militiamen while so engaged, as well as the subordination of the military to the civil authorities in the territory into which they are directed to go. These important questions come up in an action to recover damages for false arrest, brought by the appellee Smith, a

private citizen of Caldwell county, against the appellant Franks, McFarland, Cook, Kennedy and Gans, members of the State militia. During the trial, the action against Kennedy and Cook was dismissed without prejudice by the appellee, and the court peremptorily instructed the jury to return a verdict in favor of McFarland and Gans. After the action was thus disposed of as to these parties, it proceeded against the appellant Franks, and the jury assessed the damages against him in the sum of one thousand dollars. From a judgment upon this verdict Franks appeals, and from the order of the trial court directing a verdict in favor of McFarland and Gans the appellee Smith prepared but did not prosecute an appeal.

At the time and before the arrest complained of, Gans was captain of Company C, Third Infantry, Kentucky State Guards, and Franks was a sergeant, and Cook, McFarland and Kennedy were privates in the same company. In making the arrest of Smith, they were acting under the orders of superior officers in the military service, and independent of the civil authorities of Caldwell county. They did not report to or receive any directions from the sheriff or jailer of Caldwell county, or the mayor or marshal of the city of Paducah, or any other civil officer in the city of Princeton or the county of Caldwell, in which county they made the arrest complained of.

The separate answers of Franks, McFarland, Cook, Kennedy and Gans, which were substantially the same, admitted the arrest and detention of Smith by them, and in justification of their acts they set up that they were at the time regularly enlisted and duly qualified and acting members of Company C, Third Regiment Infantry, of the Kentucky State Guards, and members of a detachment of said regiment stationed at Princeton, in Caldwell county, Kentucky. That Captain Gans was under the command of E. B. Bassett, the duly appointed, qualified and acting major of said regiment, and Bassett as major had general command of the militia then in active service in Western Kentucky under orders from Augustus E. Willson, Governor of the Commonwealth and commander in chief of the militia of the State. That on the afternoon of the 26th of November, 1098, Captain Gans received information from Major Bassett that a movement or raid of armed men known as "night riders" was ex-

pected to be made that night in the neighborhood of Hopson and Wallonia, in Caldwell county, and was ordered by him to detail a squad of men from his detachment into said neighborhood to prevent if possible any trouble resulting from such movement or raid. That pursuant to and in obedience to said orders, Gans detailed Franks, McFarland, Cook and Kennedy on such described duty, directing them that if during any unusual hour of the night they encountered men traveling the highways in numbers more than two, to halt them, receive their explanation for so traveling at such hours, and if deemed necessary to search them and if they were found carrying concealed weapons to arrest and bring them into camp at Princeton, to be thereafter turned over to the civil authorities of the county. That these orders were given by Gans, and obeyed by Franks, McFarland, Cook and Kennedy in the performance of their duty as members of the State militia, and in obedience to orders received from superior officers. That on November 27th, about midnight, Franks, McFarland, Cook and Kennedy, who were stationed on one of the public highways of Caldwell county, encountered the appellee Smith and five other men traveling on the highway, and after halting and searching them found in the buggy of Smith and one other of the party pistols, and in pursuance of their orders took them into camp at Princeton, permitting the other four travelers to go on their way. That they had no ill will or feeling against Smith, nor any real or fancied cause for having such feeling; nor did they mistreat or cause him to be mistreated except by arresting and delivering him to Captain Gans in pursuance to orders.

With respect to the evidence, it only seems necessary to say that Franks, Cook, Kennedy and McFarland, acting under the orders of their captain, arrested Smith some time after 10 o'clock at night as he was traveling on a public highway in company with five other persons in buggies, and that finding in the buggy in which he was riding a pistol owned by him, he was arrested and carried to Princeton, the headquarters of Captain Gans, and there kept in custody by Gans until the next morning when he was turned over to the civil authorities upon the unfounded charge of carrying concealed about or upon his person a deadly weapon, as this weapon was found not on his person but in the buggy. There is no evidence

that Smith had theretofore or was then about to commit a public offense of any kind. In company with his neighbors who had attended a lodge of which they were members, he was on his way home at the time of his arrest. There is some evidence that he was treated in an abusive and insulting manner by the soldiers who arrested him, and that he suffered on account of exposure to the cold of the night. But, for the purposes of this case we will not go into the question of any misconduct on the part of the arresting officers, preferring to treat the case as the facts justify us in doing as if Smith while peaceably and rightfully traveling on the public highway was arrested and detained without authority, unless warrant for his arrest and detention sufficient to justify the militiamen can be found in the orders that were given to them by their superior officer. We will also assume that the arrest and detention of Smith was made in strict obedience to orders received by Franks and his comrades from their superior officer, Captain Gans; and that Captain Gans received the orders that he gave to Franks and the privates from his superior officer, Major Bassett; that Major Bassett was acting in obedience to and under the authority of the Adjutant General of the State; and that the Adjutant General was acting under orders from the Governor of the State. In short, we will take it for granted that the militiamen were regularly ordered into active service by the Governor of the State, and that everything the officers and privates did was strictly in obedience to orders issued by their superior officers and received by them in accordance with the laws and regulations governing the State militia.

Treating the facts in this way, it is the contention of counsel for Franks that a soldier in active service is not amenable to the civil authorities for his reasonable acts performed in strict obedience to the orders of his superiors; and that in an action against him for false arrest or for false imprisonment or detention, he can depend upon his military orders for protection, and if they were reasonable and he did not exceed the authority conferred by them, they are a complete justification for his conduct. While counsel for the appellee Smith insists, first: That the Governor has no authority in law to order into active service the State militia, unless requested so to do by the civil authorities of the county, city or town into which they are directed to go and operate, and so every-

thing they did was in violation of law. Second: That a soldier, although regularly called into active service and acting within the strict line of his military orders, has no power to make an arrest or to do any act that a private citizen might not do, and, therefore, he can make no defense that will justify his acts except such a defense as any private citizen might make, if sued upon a similar cause of action.

Considered from the standpoint of counsel, two principal questions naturally suggest themselves, First: Has the Governor in the exercise of the authority conferred upon him by law and without being requested so to do by a civil officer of any city, town or county, the power to call out and order into active service the State militia, and direct their movements and operations without placing them under the orders or control of the civil authorities or any of them in the territory into which they are sent? Second: Are members of the State militia when acting in obedience to orders given to them by a superior officer liable in a civil action for making an arrest or doing any other reasonable act they are commanded by a superior officer to do?

Section 69, of the Constitution, declares:

"The supreme executive power of the Commonwealth shall be vested in a chief magistrate, who shall be styled the 'Governor of the Commonwealth of Kentucky.'"

Section 75 provides that:

"He shall be commander-in-chief of the army and navy of this Commonwealth, and of the militia thereof, except when they shall be called into the service of the United States; but he shall not command personally in the field, unless advised so to do by a resolution of the General Assembly."

And section 81 commands that:

"He shall take care that the laws be faithfully executed."

Section 2672, of the Kentucky Statutes, in the chapter relating to the State militia, reads:

"It shall be the duty of the Governor, whenever he may deem it necessary for the safety or welfare of the Commonwealth, or when any actual or threatened invasion, insurrection, domestic violence or other danger to the public interest makes it necessary to employ military force in aid of the civil power of the government for the enforcement of the law, or to preserve the peace and the

security of the rights and lives or property of the citizens, to order into active service so much of the State Guard or military force of the Commonwealth as he may deem necessary. The State Guard can be ordered into active service only by the Governor.''

Section 2673, reads:

''The military shall be at all times and in all cases in strict subordination to the civil power.''

And section 2674:

''When in active service the Governor may direct the commanding officer of the military force to report to any one of the following named officers of the district in which the said force is employed—Mayor of a city, sheriff, jailer or marshal.''

We find from these sections of the Constitution and statute that the Governor is the chief civil officer of the Commonwealth and is charged with the duty of taking care that the laws of the State are faithfully executed. That he has authority to order the militia into active service whenever or wherever he may deem it necessary to secure the safety or welfare of the Commonwealth or to preserve the peace or lives or property of citizens of the State. That the militia can only be ordered into active service by him, but that it shall be at all times in strict subordination to the civil authorities. It will be observed that there is no limitation either in the Constitution or statute upon the power vested in the Governor to order into active service the militia of the State or to direct into what locality they shall go or operate. He is made the sole judge of the necessity that may seem to demand the aid and assistance of the military forces of the State in suppressing disorder and restoring obedience to the law. The presumption of course is that he will not exercise this high power unless it becomes necessary to maintain peace and quiet and protect the life or property of the citizen, after the local civil authorities have shown themselves unable to cope with or control the situation. But to his good judgment and sound discretion the law has left the final decision as to whether the military arm of the State shall be ordered into active service. If he acts wisely and prudently, well and good. If he acts hastily or unwisely or imprudently, there is no power in the courts to control or restrain his acts. Any attempt on the part of the judicial department of the State so to do would be an interference by one depart-

ment of the government with the power lodged in another department, and a violation of section 27 of the Constitution of the State, providing:

"The powers of the government of the Commonwealth of Kentucky shall be divided into three distinct departments, and each of them be confined to a separate body of magistracy, to-wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another."

And section 28, reading:

"No person, or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted."

The power thus lodged in the Governor is extensive, unrestrained and subject to abuse. But all power is subject to abuse. If the fact that power might be abused was sufficient to deny the granting of it, there could be no final authority and everything must be referred back to the people—the source of all power. Of course, a system of government that was denied the authority to take final action would be too weak and inefficient to maintain itself or afford due measure of security and protection to the people who created and established it; and in many instances it would entirely fail to accomplish the purpose of its existence. The power to call out the State militia was vested in the Governor, the chief executive officer of the State, for the wise and wholesome purpose of enabling him to carry into effect the mandate of the Constitution that he must "take care that the laws be faithfully executed." If this power was not lodged in him, then this provision of the Constitution would be an idle and meaningless phrase, because although charged with the duty of taking care that the laws of the State should be faithfully executed, he would have no authority to enforce the obligation imposed upon him. It is only through and with the aid of the State militia that he can make effective the authority conferred by the Constitution, and it was for this purpose that the Legislature enacted section 2672, of the Kentucky Statutes, before cited. The power conferred by this section is ample to meet every emergency that may present itself, and it gives to the chief executive of the State the fullest authority to call to his assistance in any contingency that may arise a force sufficient to quell disorder and restore peace.

Under the sanction of this statute he may act independently of any other civil authority if he desires to do so, or he may act in conjunction with the other civil authorities. He may on his own initiative order out the State militia, or he may wait until requested so to do by the local authorities in the community in which they are needed. He may place the militia at the disposal of the civil authorities, or he may through military channels control and direct, within lawful bounds, their movements and operations. Which of these courses he will pursue, he alone is to judge. The Constitution and statute have given him this power, and we could not if we desired abridge it. Ela v. Smith, 5 Gray (Mass.), 121, 66 Am. Dec., 356. For his conduct in ordering out and controlling the movements and operations of the State militia, the Governor is answerable only at the bar of public opinion, unless it be that abuses might warrant impeachment proceedings. It can not for a moment be entertained with the Governor must delay action until requested by the local authorities. This limitation upon his constitutional duty would in many instances deny him the right to take prompt and decisive action to suppress threatened or actual disorder or violence and enforce obedience to the law. It would interfere with the express authority conferred upon him by the statute and would in many instances and in many places be disastrous to the peace and welfare of the State. Primarily, the enforcement of the law is with the local civil authorities, but at times they are too weak to control the lawless elements that exist in every society, and at other times they might be in sympathy with the forces who want to take the law into their own hands. But, whatever the reason that may exist for the failure or inability of the local civil authorities to suppress violence and disorder, when it comes to pass that they cannot or will not do it, then it is not only the right but the plain duty of the Governor to act. Ours is a government of law. Under its authority and through its agencies alone wrongs must be redressed and rights protected. Unless this were so, there would be no assurance of peace or quiet for the law abiding and order loving who constitute so large a part of our people. The life and the property of the citizen would be insecure, and the lawless, reckless and violent would be at liberty to exercise at will their disregard of civil authority. In every age of the world and in

every State and country, it has been found necessary to the stability and efficiency of government that there should always be at its command a military force to support the civil authorities in times of disorder and riot; and this is so because there has never been and will never be a time in the history of any State or country in which the passions and prejudices of the people, when aroused by some real or fancied wrong, has not prompted men to take into their own hands the redress of genuine or imaginary injuries or the enforcement of what they conceived to be their rights. For the truth of these statements we need not go beyond our own Commonwealth. In every Constitution we have had, provision has been made for a military force, and one of the first laws enacted after the establishment of the State had for its purpose the creation of a State militia. The men who placed, and who have kept, these provisions in the organic law as well as the statute knew the temper of our people—what they had done, and what they would do. Indeed the history of the State, from its beginning, is filled with examples of attempts—too many of them successful—to disregard and overthrow the law. When an emergency arises calling for quick and decisive action to protect life or property from violence, and the local civil authorities are unable or perhaps unwilling to afford protection, must the Governor of the State, in disregard of his oath and duty, sit supinely by and witness lawless men burn or destroy the property of the citizen, or kill or drive him from his home or business while waiting for a call from the local officials that may never come, before ordering out the forces that can and will restore order, preserve peace and protect life and property? Or, should he, when confronted with a situation like this, do his duty under the Constitution and law? There can be but one answer to this question. The honor and dignity of the State, its good name at home and abroad, as well as the imperative obligation resting upon every government to maintain peace within its borders and protect the lives and property of its people, demand that he shall act with all the power and force at his disposal to suppress the existing disorder and violence. The supremacy and authority of the law at all times and places must be asserted and maintained at all hazard and at whatever cost. There should not be a moment in the life of any orderly, well established and republican form of

government, like ours, when it has not the means and the ability to give to every citizen that peace, safety, happiness and protection guaranteed to him by the Constitution. Having this view of the power and duty of the Governor, it must nevertheless be kept in mind that in its exercise he acts in his capacity as a civil officer of the State and not as commander-in-chief of its army. As the chief civil magistrate of the State, he calls out and must direct in accordance with law the movements and operations of the military forces. "The military shall be at all times and in all cases in strict subordination to the civil power." It is so written in section 22 of the Bill of Rights. We have not, and cannot have, in this state a military force that is not and will not be subordinate to the civil authorities. The military cannot in any State of case take the initiative or assume to do anything independent of the civil authorities. Ours is a government of civil, not military, forces. The militia in active service and in every emergency that arises in such service is subordinate to the civil power. The soldier and the citizen stand alike under the law. Both must obey its commands and be obedient to its mandates.

It follows from these considerations that we are not disposed to agree with the doctrine announced by the Supreme Court of Colorado in In re Moyer, 35 Colorado, 159, 12 L. R. A., N. S., 979, that in certain emergencies the civil law may be suspended by military orders. Or with the Supreme Court of Pennsylvania in the case of Commonwealth v. Shortall, 206 Pa. St., 165, 98 Am. St. Rep., 759, 65 L. R. A., 193, where the court, in discussing the relative supremacy of the military and civil authorities in a state of case in which the civil authorities being unable to preserve peace and quiet the military of the State was called out to restore order, said:

"Martial law exists whenever the military arm of the government is called into service to suppress disorder and restore the public peace. * * * The resort to the military arm of the government therefore means that the ordinary civil officers to preserve order are subordinated and the rule of force under military methods is substituted to whatever extent may be necessary in the discretion of the military commander. To call out the military and have them stand quiet and helpless, while mob law overrides the civil authorities would be to make the government contemptible and destroy the

purpose of its existence. The effect of martial law, therefore, is to put into operation the powers and methods vested in the commanding officer by military law. So far as his powers for the preservation of order and security of life and property are concerned, there is no limit but the necessities and exigencies of the situation. And in this respect there is no difference between a public war and domestic insurrection.''

We are not willing to concede that in any exigency that may arise the military is superior to the civil authorities. We do not apprehend that any conditions could come up that would justify us in so holding. Nor do we believe that the time will ever come when the military forces of the State, acting under and in obedience to the civil laws of the State will not be able to control under the authority conferred by these laws any situation that may present itself.

We will now endeavor to determine what protection if any from civil or criminal liability the soldier has when acting in obedience to the orders of his superior officer. What may he do and yet be safe from suit at the hands of those he has molested in the performance of his military duty? These questions involving as they do the rights and liabilities of the soldier in active service are of great importance, but with the aid of precedents, we will attempt to lay down a safe yet efficient rule for guidance in cases in which they may arise.

The views concerning these questions presented in argument are widely separated. To restate them—one is that the soldier engaged in active service should be treated as a private citizen, with no more authority than such a citizen to make an arrest, suppress disorder or prevent crime. The other is that the military forces of the State when called into active service have the right to take such action as in the judgment of the commanding officer may be necessary to control the situation, and the right to act in obedience to orders received through regular military channels, and that when so acting they are not amenable in the civil or criminal courts for executing any reasonable orders received from a commanding officer. In our opinion, each of these positions is open to serious objection. One gives too much power to the military; the other, not enough. One makes the soldier a mere figurehead, the other a machine to do the bidding of his superior. If we are not permitted to look

to the common law for the authority of the private citizen to assist in suppressing disorder and restoring peace, and must be confined as insisted by counsel to the statute law of the State, the only authority given in this respect is found in section 37 of the Criminal Code, providing that "a private citizen may make an arrest when he has reasonable grounds for believing that the person arrested has committed a felony," and in section 38 providing that a magistrate or judge may order a private person to arrest any one committing a public offense in his presence. It must be manifest that if this is the limit of his authority, and that the soldier has no more, it would be a useless thing to call out the militia to aid the civil authorities in suppressing disorder or restoring peace, unless they were placed under the control of the mayor or marshal of the city, or sheriff or jailer of the county, into which they were ordered to go. As the right of a private citizen to arrest is confined, except when acting in the immediate presence of a magistrate or judge, and in obedience to his direction, to cases in which he has reasonable grounds for believing that the person he is about to arrest has committed a felony, there are few instances in which he could efficiently act to suppress disorder or prevent threatened violence. Irreparable injury may be done to both person and property without the offense being a felony, and it is rare that offenses are committed in the presence of a judge or magistrate. Lawless bands or assemblies of persons might disturb the peace, engage in riotous conduct, threaten the life or property of the citizen, assault and beat him, destroy his property and drive him from his home and business, and yet not commit a felony. A body of rioters might put and keep the people of any community in terror, commit innumerable depredations and infractions of the law, be a continual menace to the peace and quiet of the people, and yet their conduct would not amount to a felonious act. In short, they could commit almost every species of malicious mischief that reckless and evil disposed men could think of, to harm the persons and injure the property of those who had incurred their enmity, and yet the private citizen under the statute quoted, unless to protect himself or his family or his property, would not have the legal right to interfere. In view of these limitations imposed by law upon the right of private citizens to take part in suppressing dis-

order, it needs no argument to demonstrate that if the power of the soldier is no greater than that of the private citizen the law creating and sustaining the State militia had better be abolished. This limitation would paralyze the military arm of the State and subject it to the contempt of all classes of people. It is no answer to say that this humilitating spectacle might be avoided if the militia were directed to report to and receive orders from one of the civil officers we have mentioned and thereby have authority to take such lawful action as the civil officer might direct. In some instances this might be a satisfactory solution of the difficulty suggested; in others, it would not. As we have pointed out, conditions might be such that the civil officers would be in sympathy with the rioters, or indifferent to the conditions existing, or afraid to assert authority, and it was to provide for a contingency in which conditions like this might appear that the law invested the Governor with the power to control and direct within legal bounds the operation of the militia without subjecting them to the supervision of other civil officers. And for the reasons heretofore stated, we are not disposed to adopt a rule of action that would under any circumstances prevent or interfere with the Governor of the State in his efforts to restore peace and assert and maintain the authority of the law. On the other hand, to say that the State militia acting in obedience to military orders may commit any act that may suggest itself to the commanding officer as being necessary to restore peace and quiet, although such act might be a greater violation of law than was committed by the person it was visited upon, would place the militia above the civil authorities, and give to the soldier power not conferred upon the civil officer charged with the duty of enforcing the law. The command of the officer would take the place of the statute, and there would be no limitation upon his conduct except such as his judgment and discretion might dispose him to adopt. We can find no warrant, either in the Constitution or statute of the State or the history of constitutional government, for investing the military forces of the State with arbitrary power like this. Of course, we have not in mind a state of case in which actual war between contending armies, or nations, or States, exist, as it would be entirely beyond the scope of the questions we are considering to venture an opinion much less lay down any rule of action

for the government of military forces operating in territory where a state of war actually prevailed.

It is said, however, that the investment of the officers and privates of the State militia with the power and immunity claimed in argument would not be abused, and. that it must be presumed they would act in a reasonable and prudent manner, using no more force than was reasonably necessary to accomplish the purpose intended. But we can not give our consent to this proposition for two reasons. In the first place, it would be a violation of the law of the State as we understand it; and in the second place, the history of military affairs is not calculated to inspire the belief that at all times soldiers will act with prudence and discretion. Indeed the facts of the case before us illustrate the unreasonable extent to which the militia will go in furtherance of what they conceive to be their duty.

Captain Gans testified that:

"My general instructions to patrol at night which covers this case were that when two or more men were found between 10 and 4 o'clock, that they were always covered of course, when they were halted, with our guns, and to question them and find out if they could what they were doing out, and where they were going, and to search them if they thought it necessary, and if they found arms to bring them into camp to be turned over to the civil authorities."

This order was given and carried into execution by the arresting officers, although at the time and for weeks preceding there had been no violence or disorder in the neighborhood or community in which the arrests were made. The only excuse or defense made for the arrest of Smith is that Captain Gans in giving the orders, and Franks and his comrades in executing them, were acting under orders received from superior military officers. And it is earnestly insisted that these orders furnished a complete justification for the arrest and detention of Smith, and the trial court should have so ruled. It is said in argument that it is the duty of a soldier to obey, without inquiry or question, all reasonable orders received from his commanding officer, and that as this was such an order as a person of common sense might believe to be warranted by the surroundings the soldier is not liable to suit for obeying it. If this argument is sound, then it naturally and logically follows that any private

citizen may at any time and under any circumstances be deprived of his liberty and left without redress for the injury done him. If soldiers armed with guns have authority to arrest and take into custody in the midst of a peaceful community persons whom they find riding on the public highway after ten o'clock at night, who are not charged with and have not committed any offense against the law, and who are in an orderly and well behaved manner returning to their homes, they can also by the same authority and without any other reason or cause take the private citizen from the midst of his family, the farmer from his plow, the blacksmith from his forge, and the merchant from his place of business. In fact, no person at any time or place would be free from military arrest and detention. It may be and doubtless is true that looking at the matter from a military standpoint, the order to act as Franks did was not such an unreasonable command as that a soldier of common sense would feel authorized to refuse to obey. But be this as it may, conduct like this is such an intolerable invasion of private rights and so at war with the principles set forth in the bill of rights that "the people shall be secure in their person, houses, papers and possessions from unreasonable search and seizure," that we cannot consent that all military orders however reasonable they may appear will afford protection in the civil or criminal courts of the State. We have in this State an elaborate system of common and statute law, intended to and that in fact does meet every requirment of an orderly and well regulated society. There is no interference with the peace or quiet of the citizen or molestation of his person or property that under these laws may not be punished. All these offenses against law and order have been carefully created and defined, and it cannot be seriously insisted that the mere dictum of a military officer may supersede the lawmaking department of the government or that a soldier of his own will can convert into offenses against the peace and dignity of the Commonwealth acts that the Legislature in its wisdom did not deem proper to so denominate. This condition can only exist when the civil law has been supplanted by the military, and the soldier is greater than the magistrate. As said by the Supreme Court of Illinois in Johnson v. Jones, 44 Ill., 142, 92 Am. Dec., 159:

"The right of the citizen to his personal liberty, except when restrained of it upon a charge of crime and

for the purpose of judicial investigation or under the command of the law pronounced through a judicial tribunal, is one of those elementary facts which lie at the foundation of our political structure. The cardinal object of our Constitution, as it is the end of all good government, is to secure the people in their right to life, liberty and property. The more certainly to attain this end the framers of our Constitution not only proclaimed certain great principles in the bill of rights, but they distributed governmental power into three distinct departments, each of which while acting in its proper sphere was designed to be independent of the others. To the legislative department it belongs to declare the causes for which the liberty of the citizen may be taken from him; to the judiciary department, to determine the existence of such causes in any given case; and to the executive, to enforce the sentence of the court. If a citizen can be arrested except upon a charge of violated law and for the purpose of taking him before some judicial tribunal for investigation, then it is plain that the executive department has usurped the functions of the other two, and the whole theory of our government so far as it relates to the protection of private rights is overthrown. * * * As no charge is made, no judicial investigation had, it is left entirely to the caprice of the government to determine what persons shall be seized. The power to thus arrest being once conceded, every man in the State from the Governor down to the humblest citizen would hold his liberty at the mercy of the military officer in command.''

If then the soldier is not protected, from suit or prosecution by his military orders, the inquiry naturally suggests itself—what can he do to save himself from punishment for refusing to obey the command of his superior officer? From liability in a civil action by the person he has wronged or from criminal proceedings on the part of the Commonwealth? This embarrassing position in which the soldier finds himself is well treated in the Law of the Constitution by Dicey, page 281, where he says:

''A soldier is bound to obey any lawful order which he receives from his military superior. But a soldier can not any more than any civilian avoid responsibility for breach of the law by pleading that he broke the law in bona fide obedience to orders of the commander-in-chief. Hence, the position of a soldier may be both in

theory and in practice a difficult one. He may, as it has been said, be liable to be shot by a court martial for disobedience of orders, or to be hanged by a judge and jury if he obeys it. * * * What is, from a legal point of view, the duty of a soldier? The matter is one which has never been absolutely decided. The following answer given by Mr. Justice Stevens is, it may be fairly assumed, as nearly correct a reply as the state of the authorities make it possible to provide.: * * * 'The only line that presents itself to my mind is that a soldier should be protected by orders for which he might reasonably believe his officer to have good grounds for giving. The inconvenience of being subject to two jurisdictions, the sympathies of which are not unlikely to be opposed to each other, is an inevitable consequence of a double necessity of preserving on the one hand the supremacy of the law, and on the other the discipline of the army.' * * * While, however, a soldier runs no substantial risk of punishment for disobedience to orders which a man of common sense may honestly believe involve any breach of law, he can under no circumstances escape the chance of his military conduct becoming the subject of inquiry before a civil tribunal and cannot avoid liability on the ground of obedience to superior orders for any act which a man of ordinary sense must have known to be a crime.'' To the same effect is Medley's Constitutional History, p. 481.

In Hare's American Constitutional Law, Volume 2, chapter 41, page 906, this learned writer lays it down that:

''When a riot assumes such proportions that it cannot be quelled by ordinary means, and threatens irreparable injury to life or property * * * arms may be used as in battle to bear down resistance, and if loss of life ensues the circumstances will be a justification. The measure does not, however, cease to be civil, or fall beyond the rules which apply when a house is entered in the night by burglars, or a traveler shoots a highwayman who demands his money. Nor will it change its character because the military are called in and the sheriff delegates his authority to the commanding officer. As Lord Mansfield showed in the debate on the Lord George Gordon riots, in 1780, soldiers are subject to the duties and liabilities of the citizens, although they wear a uniform and may like other individuals act as

special constables or of their own motion for the suppression of a mob, and if the staff does not suffice, employ the sword. The intervention of the military does not introduce martial law in the sense in which the term is understood under despotic governments and even by some distinguished jurists, because agreeably to the same great magistrate and the settled practice in England and the United States they are liable to be tried and punished for any excess or abuse of power, not by the martial code, but under the common and statute law."

Running through these authorities, and others that we have examined, will be found the principle that the soldier is amenable to the civil authorities for his acts in violation of law; but that "yet a soldier runs little risk in obeying any order which a man of common sense so placed would regard as warranted by the circumstances. And if the circumstances are such that the command may be justifiable, he should not be held guilty for declining to decide that it is wrong with the responsibility incident to disobedience unless the case is so plain as not to admit of a reasonable doubt." Hare's Am. Con. Law, vol. 2, chap. 41, page 920; Dicey Law of the Con., page 285; Commonwealth v. Shortall, 206 Pa. St., 165. 98 Am. St. Rep., 759, 65 L. R. A., 193; Luther v. Borden, 7 Howard (U. S.), 45, 12 L. Ed., 581; Mitchell v. Harmony, 13 Howard (U. S.), 115, 14 L. Ed., 75; Ex Parte Milligan, 4 Wallace (U. S), 2, 18 L. Ed., 281; McCall v. McDowell, 1 Abbott (U. S.), 212; United States v. Clarke, 31 Fed. Rep., 710; Riggs v. State, 3 Cold. (Tenn.), 85; Christian Co. Court v. Rankin, 2 Duv. (Ky.), 502; Hogue v. Penn., 3 Bush (Ky), 663.

With the liability of the soldier under the military law for refusing to obey the orders of his superior officer we are not much concerned in disposing of the matter before us. Whether the military law can punish him or not for disobedience of an order that if executed would involve him in civil or criminal liability, is a question that it is well to postpone answering until it comes up. But, what orders of his superior a soldier may obey and be exempt from civil liability, and what orders his obedience of will subject him to suit, are before us and must be disposed of. Upon this point, after mature consideration, we have reached the conclusion that any military order, whether it be given by the Governor of the State or an officer of the militia or a civil officer of a

city or county, that attempts to invest either officer or private with authority in excess of that which may be exercised by peace officers of the State is unreasonable and unlawful; and if it is obeyed, the officer or private giving obedience subjects himself to such punishment and liability as the penal and civil laws of the State might inflict against a private individual guilty of similar transgression of the law or the rights of the citizen. We feel at liberty to thus define the limits within which soldiers may lawfully act, because all the authorities agree that the courts may at the instance of any person who has been aggrieved or on behalf of the Commonwealth inquire into their acts and doings and determine whether or not they have been guilty of any conduct that would subject them to liability or punishment. The only difference between our ruling and that obtaining in the authorities cited is that we define more precisely than they do what orders a soldier is justifiable in executing, and hold as a matter of law that these orders are confined to such as a peace officer in the discharge of his duty might execute. In respect to these orders, the powers of the military and local civil officers of the State are identical. What one can not do, neither can the other; what one may do, so may the other. The soldier has the same measure of protection and is subject to the same liability, whether he is acting under the orders of a military officer, independent of the local civil authorities, or is acting under immediate direction of these authorities. Neither has the right to give any orders or directions except those that a peace officer of the State might rightfully execute; and if the soldier does only what a peace officer may do, then he is entitled to the immunity afforded peace officers in the performance of their duty. This rule of conduct is of course not free from objection, but upon the whole we think it furnishes a reasonable guide for the militia and describes with as much accuracy as conditions will permit the lines within which they may act with safety and beyond which they may not go without peril. Its observance will protect the quiet and orderly citizen from disturbance, and arrest and leave the law breaker to be dealt with as his conduct deserves.

Let us now see what the military can do surrounded by this limitation upon its power, and whether or not it can be an efficient force in every emergency that may

require its assistance. In treating this aspect of the case, we shall not undertake to go into details concerning what a peace officer may or may not lawfully do. Cases presenting this question come up in so many different forms that, excepting some general principles that are applicable to all, each case must be adjudged by the facts it presents, and it would be outside the scope of the matter before us to undertake any discussion of this feature. It has been treated of in numerous opinions of the court. We are chiefly interested in the inquiry whether or not if the power of the militia is confined to the doing of those things that a peace officer may rightfully do, will its operations be so embarrassed that it can not successfully master any conditions that it may be called on to deal with. Under section 26 of the Criminal Code, sheriffs, constables, coroners, jailers, marshals and policemen are peace officers; and other officers are so designated by various sections of the statute. Section 36 of the Criminal Code provides that:

"A peace officer may make an arrest—without a warrant, when a public offense is committed in his presence or when he has reasonable grounds for believing that the person arrested has committed a felony."

And in other sections of the Criminal Code and statute and under the common law there are provisions further defining the powers and duties of peace officers in cases of riots, routs, unlawful assemblies, or when two or more persons have confederated or banded together for the purpose of intimidating, threatening, alarming, disturbing or injuring any person or molesting or destroying any property. Under the common law and these various statutes the military acting as peace officers would have the right to arrest any person who had committed a felony, or was committing in their presence an act that constituted a public offense under the statute or at common law, and the right to disperse, control and suppress riots, routs, unlawful assemblies or bodies of men acting in concert for the purpose of intimidating, threatening, alarming, disturbing or injuring any person or molesting or destroying property, with all the means and force necessary to accomplish these ends. Ela v. Smith, 5 Gray (Mass.) 121, 66 Am. Dec., 356; Russell on Crimes, vol. 1, page 266-289; Blackstone's Com., vol. 4, p. 143. This statement does not of course describe all the conditions under which the military acting

as peace officers may make arrests or disperse disorderly or other gatherings. It is only intended in a general way to illustrate that when the militia is armed with the power and authority of peace officers, under the statute and at common law, there need be no apprehension that they can not effectively control any situation demanding their presence. The militia of the State are in truth peace officers. The purpose of their existence is to preserve the peace and quiet of the State in its broadest sense, and when this has been done, the life and property of the citizen is secure.

It results from what we have said that the conduct of Franks and his associates in arresting Smith was indefensible. He had not committed any act that would justify a peace officer in arresting or detaining him. Gans and McFarland participated in his detention and so were equally liable with the others, but no appeal is prosecuted against them.

It is said that the verdict against Franks is excessive, but we are not disposed to disturb it on this ground.

Wherefore. the judgment is affirmed.

Whole court sitting.