FLUKE *et al.* v. CANTON, *Adjutant General.*

No. 583.    Opinion Filed April 25, 1912.

(123 Pac. 1049.)

1.    MILITIA—Constitutional Provisions—Bill of Rights.   Under section 14, art. 2 (Bills of Rights), of the Constitution of this state, providing that the military shall be held in strict subordination to the civil authorities, the state militia in active service, and in every emergency which arises therein, is subject to the control of the civil authorities.

2.    MILITIA—Control—Jurisdiction of Courts.   The courts of this state having jurisdiction may, at the instance of any person who has been aggrieved or on behalf of the state, inquire into the acts of soldiers or officers of the militia of this state and determine whether they have been guilty of any conduct that would subject them to liability or punishment.

3.    MILITIA—Control—Jurisdiction of Courts.   A member or officer of the state militia as a soldier in active service is not relieved

Opinion of the Court.

from civil liability for his acts while so engaged on the ground that he acted in obedience to an order received from the Governor as commander in chief through the regular military channels.

4. **JUDGMENT — Courts — Contempt — Self-Executing Judgment — Jurisdiction of Appellate Court—Disobedience of Void Order.** A judgment of this court rendered under authority of sections 16 and 17, act of April 17, 1908 (Sess. Laws 1907-08, p. 385), conferring exclusive original jurisdiction on this court over all controversies arising under the provisions of said act, wherein the county seat, under a certain election held to permanently locate the same in Delaware county, was determined to be at the place of Jay, is self-executing.

(a) This court has not original jurisdiction to restrain the adjutant general of this state from interfering with the county officers of said county in the location of their offices and the paraphernalia of their offices in any particular building in Jay.

(b) This court having not jurisdiction to issue the restraining order, such order having been issued without such jurisdiction is void and no contempt could be committed in refusing to obey such order.

(Syllabus by the Court.)

Turner, C. J., dissenting in part.

Original proceeding on the complaint of T. C. Fluke and others against Frank M. Canton, adjutant general, for contempt. Discharged.

*Stuart, Cruce & Gilbert,* for complainants.

*Chas. West,* Atty. Gen., for respondent.

WILLIAMS, J. On January 5, 1912, the complainants represented to this court by proper petition: That in December, 1908, upon a petition filed by a sufficient number of the citizens of Delaware county, an election was called having for its object the removal of the temporary county seat from Grove, Okla., to a place called Jay; that as a result of said election, upon the face of the returns thereof, the place of Jay was declared to be the county seat of Delaware county.

That afterwards, in due time, a proceeding was instituted in this court for the purpose of contesting said election and preventing the removal of the records of said county from the temporary county seat at Grove to the place called Jay; that a tem-

porary injunction was issued and a referee appointed to hear the evidence and report to this court his findings of fact and conclusions of law.

That on the 28th day of June, 1911, this court rendered judgment thereon declaring the result of said election in favor of the place called Jay, and dissolving the temporary injunction therein issued.

That thereafter, on December 4, 1911, the Honorable Lee Cruce, Governor of the state, issued a proclamation in conformity with said judgment declaring Jay the county seat of said county; that on January 2, 1912, said proclamation was by the county commissioners of said county, while in regular session, duly spread of record, and the officers of said county were directed to move their records and all paraphernalia of office to a certain two-story reinforced concrete fireproof building in Jay.

That at the time of the institution of said contest the place called Jay was unincorporated; that subsequent to the institution of said contest the place called Jay was duly incorporated as the town of Jay and a plat of its territorial limits filed in the office of the register of deeds at Grove, then the county seat of said county.

That for and on behalf of the county of Delaware said board of county commissioners contracted for the building hereinbefore mentioned for the period of five years, said building to be used for a courthouse, and for the use of the various officers of the county; that, after said proclamation heretofore mentioned had been duly spread of record, the county commissioners of said county adjourned to meet at their next regular meeting in said building at Jay; that the officers of said county, acting in pursuance of the resolution of the county commissioners and the orders given by them, proceeded to remove their records and paraphernalia of office to the courthouse provided for them by said county commissioners and are now installed in said building and performing their duties as county officials as provided by law.

That on January 3, 1912, the Honorable Lee Cruce, Governor of the state, issued another proclamation declaring the result

of said election and proclaiming the place called Jay to be the county seat of Delaware county, describing a particular ten acres by definite metes and bounds, and instructing the officials of said county to transfer all records and paraphernalia of office to a place within the limits described as being said ten acres and there install their offices; that said county officials refused to transfer said records to the limits described by the Governor for the reason that no adequate accommodation had been prepared and no building of sufficient safety could be found in which said records could be cared for and their duties as officers of the county performed; that, prior to the issuance of said proclamation, a proceeding was instituted in the district court in and for said Delaware county, and heard before the Hon. Thomas L. Brown, sitting as judge in said district, to restrain said county commissioners from occupying or using said building in which the records of said county were located for courthouse purposes; that, upon a hearing, the temporary relief prayed for by the petitioners in that proceeding was denied, but said cause is now pending in the district court of said county for a final hearing upon its merits.

That the officials of said county have at no time failed or refused, nor will they fail or refuse, to obey the mandate or orders of any court of competent jurisdiction; that no insurrection or breach of the peace has occurred, nor is there any imminent danger thereof; that no forcible obstruction of the execution of the laws has been offered, nor is there reasonable apprehension thereof; that no request has been made by the district judge, county judge, or the sheriff, asking aid in suppression of any breach of the peace, tumult, riot, or resistance to the process of this state, nor does any imminent danger of such condition arising exist; that it was alleged that said town of Jay and the citizens thereof were in quiet and peaceable condition and amenable to any process which might be served upon them.

"That the Hon. Frank M. Canton, adjutant general of the state of Oklahoma, is now at the town of Jay and in his official capacity attempting to move the records and the paraphernalia of office belonging to the various officers of the county of Delaware, state of Oklahoma, to the ten acres herein mentioned."

Complainants further averred that they were informed and believed that a company of militia was mustered into service under his orders for the purpose of assisting in the removal of said records, books, and paraphernalia; that all of the actions of the said adjutant general were without warrant or authority of law; and that no request had been made by any officer authorized to make the same for his assistance.

Complainants then prayed for a temporary restraining order restraining the said Frank M. Canton, adjutant general of the state of Oklahoma, and his subordinate officers and all persons acting by, through, or under him, from interfering with the officials of said county, from moving, or attempting to move, any of the records of said county, and directing him to return, in the event said records should have been moved, the same to their proper places, and return to the custody of the various officers in whose control the law requires them to be, and that upon final hearing said temporary writ be made permanent.

This court, in an order concurred in by a majority of its members, directed that a restraining order issue as prayed for in order to preserve the *status quo* until a hearing might be had upon this petition. That proceeding was entertained on the theory that this court had jurisdiction in the premises to protect its own judgment, and the restraining order was issued in order that a hearing might be had to determine whether the county commissioners could arrange for a courthouse in any part of Jay, including the extended limits, or whether they were confined to the original ten acres.

On February 13, 1912, the restraining order was served upon General Frank M. Canton by wire but after he had removed said records from the building designated by the board of county commissioners to the ten acres designated in the proclamation of the Governor. Thereupon he reported his action to the Governor and the Governor ordered him to disregard the orders of this court. Thereafter a complaint was filed against General Frank M. Canton in this court by the complainants asking that a citation issue

against him for contempt in the premises. Said citation was served by the marshal of this court.

Thereafter upon February 29, 1912, the following order was made by the Governor, as Commander in Chief:

"Executive Military Order No. — —

"General F. M. Canton, the adjutant general, is hereby directed on or before March 5, 1912, in the office of the clerk of the Supreme Court, to make return to the order of the Supreme Court dated February 20, 1912, in case No. 583, as shown by the attached return.

"Lee Cruce,
"Governor and Commander in Chief."

Under date of January 3, 1912, a certain order was made by the Governor as Commander in Chief as follows:

"January 3, 1912. Executive Military Order No. —

"General F. M. Canton, the adjutant general, is hereby directed to proceed at the earliest possible time to Delaware county and take such steps as are necessary to carry into effect the provisions of the proclamation issued by me on the 3d day of January, 1912, declaring the place designated as 'Jay,' consisting of ten acres of ground platted into lots and blocks, as the county seat of Delaware county.

"The law makes it incumbent on me to see that the will of the voters in this matter is carried into effect. You will explain to the county officials that there is no disposition upon the part of the chief executive of this state to usurp any authority, and that what is being done in this matter is being done in an effort to discharge my duty as defined by the Constitution of Oklahoma, and it is the duty of every local official who has sworn to uphold the Constitution, to aid you in every proper way in carrying into effect this proclamation.

"You will present the proclamation to the board of county commissioners with the request that they act in conformity with the same. Do not resort to military force unless it becomes absolutely necessary in order to enforce the provisions of the proclamation, and report to me the results of your efforts.

"[Signed] Lee Cruce,
"Governor and Commander in Chief."

On January 11, 1912, the adjutant general made the following report to the Governor:

"Hon. Lee Cruce,

"Governor and Commander in Chief of the Oklahoma National Guard, City.

"Sir: I have the honor to submit herewith my report on compliance with executive order No. 1.

"On January 3d, 1912, I was ordered by you to proceed at the earliest possible moment to Delaware county, Oklahoma, and to see that the county records of that county were moved from the new town of Jay, Delaware county, to the old town of Jay in Delaware county, in accordance with the proclamation that you had issued declaring the permanent county seat of Delaware county to be at old Jay in Delaware county, and in accordance with the will of the people as expressed at a special county seat election held in Delaware county, Oklahoma, in December, 1908.

"After receiving your order, also copy of your proclamation, I caught the first east-bound train out of the city at 7:30 p. m., arriving at Afton, Ottawa county, at three o'clock a. m., January 4th. I left Afton for Grove, a distance of twenty miles, at six o'clock on the mail hack. Upon my arrival in Grove I immediately held a conference with a number of the Delaware county officers, including two of the county commissioners, the county attorney, and the sheriff. I read your proclamation to them and the order for the removal of the county records. I asked them if they were willing to move the records themselves in accordance with your proclamation, but as the county records had been moved from Grove to new Jay just a few days prior to this time, with the consent of two of the commissioners and the county attorney, Mr. Carver, chairman of the board, and Mr. Coppage, county attorney, were not willing to promise me that the county officers would move the records again. I then told them that I had come over there to move the records under an executive order from you, and that I intended to move them even if I had to call out the national guard of the state to assist me in doing so, but that if the commissioners were willing to go down with me to the old town of Jay and receipt me for the records after I had moved them that I would take chances on moving them myself without having to call any of our troops to my assistance. They agreed to do this. I then got a hack and driver, and the sheriff, chairman of the board of county commissioners and myself immediately proceeded to the new town of Jay—twelve miles from Grove. We arrived there about dark on the 4th inst., and all remained there until morning. I had instructed Mr. Gray, one of the commissioners who lives at the old town of Jay, to

have plenty of teams on the ground at new Jay early on the morning of the 5th. The teams came in and we commenced loading the records pretty early. I loaded eighteen wagon loads of the records and moved them to the old town of Jay one-half mile distant, and finished moving at 11:30 a. m., and placed the records in the courthouse at old Jay. The commissioners then receipted me for the records and I returned to Grove, arriving there about 5:00 o'clock p. m., on the evening of the 5th of January.

"In a short time after I arrived at Grove I received a long telegram signed by John B. Turner, Chief Justice. The telegram was in the nature of a restraining order against me, restraining me from removing the records from the new town of Jay to the old town. This was five hours after I had moved the records. The order also directed me, in case I have moved the records, to move them back to the place where I found them and allow them to remain there. As I had received no word from you as Governor and commander in chief that you had countermanded your former order to me, I disregarded the order that I had received from the Supreme Court by wire.

"I remained at Grove the night of the 5th, and on the morning of the 6th I left Grove in a raging blizzard for Afton, the nearest point to the Frisco railroad, arriving there in time to catch the west-bound passenger train for Oklahoma City, at 11:30 a. m., returning to my home station at 6:30 p. m.

"Respectfully,

"[Signed]   F. M. Canton,

"The Adjutant General."

On January 5, 1912, the Governor, as commander in chief, wired the adjutant general that he had just learned that the Supreme Court had issued a restraining order directing him not to enforce the proclamation and order which the Governor had delivered to him on the preceding day; that as Governor of the state, and commander in chief of the Oklahoma militia, he directed the adjutant general to proceed with the enforcement of said proclamation, and to call into requisition whatever force was necessary for him to employ to enforce the order.

Two jurisdictional questions have been presented by counsel: (1) May the courts control or investigate the acts of a military officer or subordinate acting pursuant to the orders of his super-

ior? (2) Had this court jurisdiction to issue the temporary restraining order which respondent is charged with violating?

On April 17, 1908, the first Legislature of this state passed an act "providing for the appointment of special election commissioners to supervise the holding of elections in counties wherein the question of a permanent location of a county seat is to be submitted to the qualified electors thereof; regulating the manner and procedure of holding such elections; canvassing the returns and declaring the result therein, and declaring an emergency." Chapter 31, art. 4, pp. 378, 387, Sess. Laws 1907-08.

Sections 16 and 17 of said act (Sess. Laws, 1907-08, p. 385) are as follows:

"Sec. 16. Exclusive, original jurisdiction is hereby conferred upon the Supreme Court of Oklahoma over all controversies that may arise under the provisions of this act, and any city, town, or place being a candidate for the permanent location of any county seat in any such election, shall have a right to a hearing before the Supreme Court upon application filed and presented within thirty days after any such election shall be held."

"Sec. 17. If any application for a hearing, upon any question arising after any such election has been held, is filed with the Supreme Court it shall be the duty of said court to make said matter special and give it precedence over the other business of said court, and consider and pass upon the same as speedily as is consistent with the business of said court."

Any proceeding to contest any such election filed in said court prior to the declaring of the result, as provided in section 6(b) of article 17 of the Constitution, would be premature. 15 Cyc. p. 400.

The result having been declared and application having been made to the Supreme Court within 30 days as provided by sections 16 and 17, art. 4, c. 31, *supra*, said court would then acquire jurisdiction of said proceedings. The court having rendered judgment in said proceedings, such judgment is self-executing (*Mayor, etc., v. Shaw,* 14 Ga. 162; *Allen v. Robinson,* 17 Minn. 113 [Gil. 90]; *Fylpaa v. Brown County,* 6 S. D. 634, 62 N. W. 962; *Honey v. Davis,* 38 Tex. 63; *Craig v. Woodson,*

128 Mo. 497, 31 S. W. 105; *Fawcett v. Superior Court,* 15 Wash. 342, 46 Pac. 389, 55 Am. St. Rep. 894; *State v. Poindexter,* 43 Wash. 147, 86 Pac. 176; *Jayne v. Drorbaugh,* 63 Iowa, 711, 17 N. W. 433; *Ewing v. Thompson,* 43 Pa. 372; *State v. Marion County Commissioners,* 14 Ohio St. 515), and the issuing of the proclamation of the Governor, after this judgment was rendered by this court, was a nullity and without any authority of law.

Section 6 of article 6 of the Constitution provides:

"The Governor shall be commander in chief of the militia of the state, except when in service of the United States, and may call out the same to execute the laws, protect the public health, suppress insurrection, and repel invasion."

Section 14 of article 2 (Bill of Rights) of the Constitution provides:

"The military shall be held in strict subordination to the civil authorities. No soldier shall be quartered in any house, in time of peace, without the consent of the owner, nor in time of war, except in a manner to be prescribed by law."

Section 8 of article 6 of the Constitution provides:

"The Governor shall cause the laws of the state to be faithfully executed, and shall conduct in person, or in such manner as may be prescribed by law, all intercourse and business of the state with other states and with the United States, and he shall be a conservator of the peace throughout the state."

The language contained in section 6 (b), art. 17, of the Constitution, that the Governor shall "cause the will of the electors to be carried into effect," is no more comprehensive than the mandate contained in section 8, art. 6, *supra.* The only difference is that one is general and the other is specific.

The settlers of the colonies that fled from the kingly proscriptions of the old world, seeking an asylum of liberty and freedom in the new, were jealous of the encroachments of military power. The English Petition of Right, the first statutory restriction of the powers of the crown, received the name of petition because the commons stated their grievances in the form of a petition, refusing to grant supplies until Charles I gave his assent to the measure. The king at first eluded the petition, but, finally moved by the threat of the commons to proceed with

charges against his favorite, Buckingham, affixed his signature to the enactment.

Section 6 of said petition is as follows:

"And whereas of late great companies of soldiers and mariners have been dispersed into divers counties of the realm, and the inhabitants against their wills have been compelled to receive them into their houses, and there to suffer them to sojourn, against the laws and customs of this realm, and to the great grievance and vexation of the people."

Section 10 is as follows:

"They do therefore humbly pray your most excellent majesty, that no man hereafter be compelled to make or yield any gift, loan, benevolence, tax, or such like charge, without common consent by act of parliament; and that none be called to make answer, or to take such oath, or to give attendance, or be confined, or otherwise molested or disquieted concerning the same or for the refusal thereof; and that no freeman, in any such manner as is before mentioned, be imprisoned or detained; and that your majesty would be pleased to remove the said soldiers and mariners, and that your people may not be so burthened in time to come; and that the aforesaid commissions, for proceeding by martial law, may be revoked and annulled; and that thereafter no commissions of like nature may issue forth to any person or persons whatsoever to be executed as aforesaid, lest by color of them any of your majesty's subjects be destroyed or put to death contrary to the laws and franchise of the land."

The cardinal principles of liberty incorporated in Magna Charta, the Petition of Right, and the English Bill of Rights were practically all brought by the English settlers to the new world and appropriated in the founding of new institutions. One of the grounds set forth in the Declaration of Independence as a reason for dissolving the governmental relations with the mother country was that the king had "affected to render the military independent of, and superior to, the civil power."

The third amendment to the Constitution of the United States provides:

"No soldier shall, in time of peace be quartered in any house, without the consent of the owner, nor in time of war, but in a manner to be prescribed by law."

Section 13 of the Virginia Bill of Rights (1776), which was framed during the battles of the Revolution, and whilst the Continental Congress was in session at Philadelphia, provides:

"That a well-regulated militia, composed of the body of the people, trained to arms, is the proper, natural and safe defense of a free state; that standing armies, in times of peace, should be avoided as dangerous to liberty; and that in all cases the military should be under strict subordination to, and governed by, the civil power."

At the present time, substantially such provision as is contained in section 14, art. 2, *supra,* appears in every state Constitution except New York's. This demonstrates the continued jealousy of the American people against the encroachment by the military against civil authority.

Chapter 66, art. 1, Comp. Laws 1909, provides for the organization of the state national guard. Section 4274 provides:

"It shall be the duty of the Governor and he is authorized and required in case of war, invasion, insurrection or breach of the peace or imminent danger thereof, or any forcible obstructing of the execution of the laws, or reasonable apprehension thereof, and at all times he may deem necessary, to order on duty the national guards or any part thereof. No member thereof, who shall be ordered out for such duty shall be liable for civil prosecutions for any act or acts done by them in discharge of their military duty on such occasions. And when the President of the United States shall make a call or requisition for troops the Governor shall first order into the service of the United States the organizations, and arms of the service as is specified in said requisition, whenever the militia or any part of it is ordered on active duty, the officers and men shall receive the same pay and allowance as provided in the United States Army, and a sum of money sufficient to pay the same is hereby appropriated and ordered paid upon vouchers audited and approved by the adjutant general."

Section 4295 provides:

"Any person who shall willfully and unnecessarily interfere with the militia or any part thereof while on drill, parade, or in the performance of any military duty, shall be guilty of a misdemeanor; provided, funeral processions, carriage of United States mail, legitimate functions of the police, progress and operation of the hospital ambulances, fire engines, fire departments,

and apparatus of the insurance patrol shall not be interfered with thereby."

Section 4313 provides:

"Active members of the national guard shall be privileged from arrest during their attendance at drills, parades, inspections, encampments, and while on active duty, and in going to and returning from the same, except in cases of treason, felony and breaches of the peace."

Section 4277 provides:

"In case of any breach of the peace, tumult, riot or resistance to the process of this state, or imminent danger thereof, or in case of public disaster, or calamity, it shall be lawful for the district or county judge, sheriff of a county or mayor of a city to call upon the commander in chief for aid, said request to be in writing or by telegraph; it shall be the duty of the commander in chief, or the adjutant general, if in his judgment the circumstances demand military aid, to order into the active service of the state the available militia in such numbers and organizations as the condition requires. The commanding officer of such militia will report to the official asking aid, and will co-operate with him and be subject to the civil authorities and will render all assistance in his power to preserve the peace and execute the laws of the state."

The constitutional provisions and the statutes of Kentucky are substantially the same as those in this state. It is insisted by the Attorney General that under these provisions the adjutant general in this case was not subject to judicial process, and the Governor seems to have acted upon this assumption, for executive military order No. 2 directs him to report to answer this proceeding in this court. A great and fundamental question of government is raised in this case, and that is as to whether the military shall be subject to the civil authority, and whether, under the exercise of military power, the functions properly belonging to the judiciary, one of the co-ordinate branches of this government, shall be wiped out.

In *Franks v. Smith*, 142 Ky. 232, 134 S. W. 484, it is said:

"The supremacy and authority of the law at all times and places must be asserted and maintained at all hazard and at whatever cost. There should not be a moment in the life of any orderly, well-established, and republican form of government

like ours when it has not the means and ability to give to every citizen that peace, safety, happiness, and protection guaranteed to him by the Constitution.   Having this view of the power and duty of the Governor, it must nevertheless be kept in mind that in its exercise he acts in his capacity as a civil officer of the state and not as commander in chief of its army.   As the chief civil magistrate of the state, he calls out and must direct in accordance with law the movements and operations of the military forces.   'The military shall be at all times and in all cases in strict subordination to the civil power.'   It is so written in section 22 of the Bill of Rights.   We have not, and cannot have, in this state a military force that is not and will not be subordinate to the civil authorities.   The military cannot in any state of the case take the initiative or assume to do anything independent of the civil authorities.   Ours is a government of civil, not military, forces.   The militia in active service and in every emergency that arises in such service is subordinate to the civil power.   The soldier and the citizen stand alike under the law.   Both must obey its commands and be obedient to its mandates.

"It follows from these considerations that we are not disposed to agree with the doctrine announced by the Supreme Court of Colorado *in re Moyer,* 35 Colo. 159, 85 Pac. 190, 12 L. R. A. (N. S.) 979, 117 Am. St. Rep. 189, that in certain emergencies the civil law may be suspended by military orders.   Or with the Supreme Court of Pennsylvania in the case of *Commonwealth v. Shortall,* 206 Pa. 165, 55 Atl. 952, 65 L. R. A. 193, 98 Am. St. Rep. 759, where the court, in discussing the relative supremacy of the military and civil authorities in a state of case in which the civil authorities, being unable to preserve peace and quiet, the military of the state was called out to restore order, said:   'Martial law exists whenever the military arm of the government is called into service to suppress disorder and restore the public peace.   *   *   *   The resort to the military arm of the government therefore means that the ordinary civil officers to preserve order are subordinated, and the rule of force under military methods is substituted to whatever extent may be necessary in the discretion of the military commander.   To call out the military and have them stand quiet and helpless, while mob law overrides the civil authorities, would be to make the government contemptible and destroy the purpose of its existence.   The effect of martial law therefore is to put into operation the powers and methods vested in the commanding officer by military law. So far as his powers for the preservation of order and security

of life and property are concerned, there is no limit but the necessities and exigencies of the situation. And in this respect there is no difference between a public war and domestic insurrection.' We are not willing to concede that in any exigency that may arise the military is superior to the civil authorities. We do not apprehend that any conditions could come up that would justify us in so holding. Nor do we believe that the time will ever come when the military forces of the state, acting under and in obedience to the civil laws of the state, will not be able to control under the authority conferred by these laws any situation that may present itself.

"We will now endeavor to determine what protection, if any, from civil or criminal liability the soldier has when acting in obedience to the order of his superior officer. What may he do and yet be safe from suit at the hands of those he has molested in the performance of his military duty? These questions, involving as they do the rights and liabilities of the soldier in active service, are of great importance, but with the aid of precedents we will attempt to lay down a safe yet efficient rule for guidance in cases in which they may arise.

"The views concerning these questions presented in argument are widely separated. To restate them: One is that the soldier engaged in active service should be treated as a private citizen with no more authority than such a citizen to make an arrest, suppress disorder, or prevent crime. The other is that the military forces of the state, when called into active service, have the right to take such action as in the judgment of the commanding officer may be necessary to control the situation and the right to act in obedience to orders received through regular military channels, and that when so acting they are not amenable in the civil or criminal courts for executing any reasonable orders received from a commanding officer. In our opinion, each of these positions is open to serious objection. One gives too much power to the military; the other not enough. One makes the soldier a mere figurehead; the other a machine to do the bidding of his superior. If we are not permitted to look to the common law for the authority of the private citizen to assist in suppressing disorder and restoring peace, and must be confined, as insisted by counsel, to the statute law of the state, the only authority given in this respect is found in section 37 of the Criminal Code of Practice providing that 'a private citizen may make an arrest when he has reasonable grounds for believing that the person arrested has committed a felony,' and in sec-

tion 38 providing that a magistrate or judge may order a private person to arrest any one committing a public offense in his presence. It must be manifest that if this is the limit of his authority, and that the soldier has no more, it would be a useless thing to call out the militia to aid the civil authorities in suppressing disorder or restoring peace unless they were placed under the control of the mayor or marshal of the city, or sheriff or jailer of the county, into which they were ordered to go. As the right of a private citizen to arrest is confined, except when acting in the immediate presence of a magistrate or judge and in obedience to his direction, to cases in which he has reasonable grounds for believing that the person he is about to arrest has committed a felony, there are few instances in which he could efficiently act to suppress disorder or prevent threatened violence. Irreparable injury may be done to both person and property without the offense being a felony, and it is rare that offenses are committed in the presence of a judge or magistrate. Lawless bands or assemblies of persons might disturb the peace, engage in riotous conduct, threaten the life or property of the citizen, assault and beat him, destroy his property, and drive him from his home and business, and yet not commit a felony. A body of rioters might put and keep the people of any community in terror, commit innumerable depredations and infractions of the law, be a continual menace to the peace and quiet of the people, and yet their conduct would not amount to a felonious act. In short, they could commit almost every species of malicious mischief that reckless and evil-disposed men could think of to harm the persons and injure the property of those who had incurred their enmity, and yet the private citizen, under the statute quoted, unless to protect himself or his family or his property, would not have the legal right to interfere. In view of these limitations imposed by law upon the right of private citizens to take part in suppressing disorder, it needs no argument to demonstrate that, if the power of the soldier is no greater than that of the private citizen, the law creating and sustaining the state militia had better be abolished. This limitation would paralyze the military arm of the state and subject it to the contempt of all classes of people. It is no answer to say that this humiliating spectacle might be avoided if the militia were directed to report to and receive orders from one of the civil officers we have mentioned and thereby have authority to take such lawful action as the civil officer might direct. In some instances this might be a satisfactory solution of the difficulty suggested; in others, it

would not.  As we have pointed out, conditions might be such that the civil officers would be in sympathy with the rioters, or indifferent to the conditions existing, or afraid to assert authority, and it was to provide for a contingency in which conditions like this might appear that the law invested the Governor with the power to control and direct within legal bounds the operation of the militia without subjecting them to the supervision of other civil officers.  And for the reasons heretofore stated, we are not disposed to adopt a rule of action that would under any circumstances prevent or interfere with the Governor of the state in his efforts to restore peace and assert and maintain the authority of the law.  On the other hand, to say that the state militia acting in obedience to military orders may commit any act that may suggest itself to the commanding officer as being necessary to restore peace and quiet, although such act might be a greater violation of law than was committed by the person it was visited upon, would place the militia above the civil authorities and give to the soldier power not conferred upon the civil officer charged with the duty of enforcing the law.  The command of the officer would take the place of the statute, and there would be no limitation upon his conduct except such as his judgment and discretion might dispose him to adopt.  We can find no warrant, either in the Constitution or statute of the state or history of constitutional government, for investing the military forces of the state with arbitrary power like this.  Of course we have not in mind a state of case in which actual war between contending armies or nations or states exists, as it would be entirely beyond the scope of the questions we are considering to venture an opinion, much less lay down any rule of action for the government of military forces operating in territory where a state of war actually prevailed.

"It is said, however, that the investment of the officers and privates of the state militia with the power and immunity claimed in argument would not be abused, and that it must be presumed they would act in a reasonable and prudent manner, using no more force than was reasonably necessary to accomplish the purpose intended.  But we cannot give our consent to this proposition for two reasons:  In the first place, it would be a violation of the law of the state as we understand it; and, in the second place, the history of military affairs is not calculated to inspire the belief that at all times soldiers will act with prudence and discretion.  Indeed, the facts of the case before us illustrate the unreasonable extent to which the militia will go, in furtherance

of what they conceive to be their duty. Captain Gans testified that: 'My general instructions to patrol at night which covers this case were that, when two or more men were found between ten and four o'clock, that they were always covered, of course, when they were halted, with our guns, and to question them and find out, if they could, what they were doing out and where they were going, and to search them if they thought it necessary, and if they found arms to bring them into camp to be turned over to the civil authorities.' This order was given and carried into execution by the arresting officers, although at the time and for weeks preceding there had been no violence or disorder in the neighborhood or community in which the arrests were made. The only excuse or defense made for the arrest of Smith is that Capt. Gans in giving the orders, and Franks and his comrades in executing them, were acting under orders received from superior military officers. And it is earnestly insisted that these orders furnished a complete justification for the arrest and detention of Smith, and the trial court should have so ruled. It is said in argument that it is the duty of a soldier to obey, without inquiry or question, all reasonable orders received from his commanding officer, and that, as this was such an order as a person of common sense might believe to be warranted by the surroundings, the soldier is not liable to suit for obeying it. If this argument is sound, then it naturally and logically follows that any private citizen may at any time and under any circumstances be deprived of his liberty and left without redress for the injury done him. If soldiers armed with guns have authority to arrest and take into custody in the midst of a peaceful community persons who they find riding on the public highway after ten o'clock at night, who are not charged with and have not committed any offense against the law, and who are in an orderly and well-behaved manner returning to their homes, they can also by the same authority, and without any other reason or cause, take the private citizen from the midst of his family, the farmer from his plow, the blacksmith from his forge, and the merchant from his place of business. In fact, no person at any time or place would be free from military arrest and detention. It may be and doubtless is true that, looking at the matter from a military standpoint, the order to act as Franks did was not such an unreasonable command as that a soldier of common sense would feel authorized to refuse to obey. But, be this as it may, conduct like this is such an intolerable invasion of private rights, and so at war with the principles set forth in

the Bill of Rights, that 'the people shall be secure in their person, houses, papers, and possessions from unreasonable search and seizure' (section 10) that we cannot consent that all military orders, however reasonable they may appear, will afford protection in the civil or criminal courts of the state. We have in this state an elaborate system of common and statute law, intended to, and that in fact does, meet every requirement of an orderly and well-regulated society. There is no interference with the peace or quiet of the citizen or molestation of his person or property that under these laws may not be punished. All these offenses against law and order have been carefully created and defined, and it cannot be seriously insisted that the mere *dictum* of a military officer may supersede the lawmaking department of the government, or that a soldier of his own will can convert into offenses against the peace and dignity of the commonwealth acts that the Legislature in its wisdom did not deem proper to so denominate. This condition can only exist when the civil law has been supplanted by the military, and the soldier is greater than the magistrate. As said by the Supreme Court of Illinois in *Johnson v. Jones,* 44 Ill. 142, 92 Am. Dec. 159: "The right of the citizen to his personal liberty, except when restrained of it upon a charge of crime and for the purpose of judicial investigation or under the command of the law pronounced through a judicial tribunal, is one of those elementary facts which lie at the foundation of our political structure. The cardinal object of our Constitution, as it is the end of all good government, is to secure the people in their right to life, liberty, and property. The more certainly to attain this end, the framers of our Constitution not only proclaimed certain great principles in the Bill of Rights, but they distributed governmental power into three distinct departments, each of which, while acting in its proper sphere, was designed to be independent of the others. To the legislative department it belongs to declare the causes for which the liberty of the citizen may be taken from him; to the judiciary department to determine the existence of such causes in any given case; and to the executive to enforce the sentence of the court. If a citizen can be arrested except upon a charge of violated law and for the purpose of taking him before some judicial tribunal for investigation, then it is plain that the executive department has usurped the functions of the other two, and the whole theory of our government so far as it relates to the protection of private rights is overthrown. * * * As no charge is made, no judicial investigation had, it is left entirely

Vol. 31—23

to the caprice of the government to determine what persons shall be seized. The power to thus arrest being once conceded, every man in the state, from the Governor down to the humblest citizen, would hold his liberty at the mercy of the military officer in command.'

"If, then, the soldier is not protected from suit or prosecution by his military orders, the inquiry naturally suggests itself, What can he do to save himself from punishment for refusing to obey the command of his superior officer, from liability in a civil action by the person he has wronged, or from criminal proceedings on the part of the commonwealth?• This embarrassing position in which the soldier finds himself is well treated in the Law of the Constitution by Dicey, page 281, where he says: 'A soldier is bound to obey any lawful order which he receives from his military superior. But a soldier cannot any more than a civilian avoid responsibility for breach of the law by pleading that he broke the law in *bona fide* obedience to the orders of the commander in chief. Hence the position of a soldier may be both in theory and in practice a difficult one. He may, as it has been said, be liable to be shot by a court-martial for disobedience of orders, or to be hanged by a judge and jury if he obeys it. * * * What is, from a legal point of view, the duty of a soldier? The matter is one which has never been absolutely decided. The following answer given by Mr. Justice Stevens is, it may be fairly assumed, as nearly correct a reply as the state of the authorities make it possible to provide: "* * * The only line that presents itself to my mind is that a soldier should be protected by orders for which he might reasonably believe his officer to have good grounds for giving. The inconvenience of being subject to two jurisdictions, the sympathies of which are not unlikely to be opposed to each other, is an inevitable consequence of a double necessity of preserving on the one hand the supremacy of the law, and on the other the discipline of the army." * * * While, however, a soldier runs no substantial risk of punishment for disobedience to orders which a man of common sense may honestly believe involve any breach of the law, he can under no circumstances escape the chance of his military conduct becoming the subject of inquiry before a civil tribunal, and cannot avoid liability on the ground of obedience to superior orders for any act which a man of ordinary sense must have known to be a crime.' To the same effect is Medley's Constitutional History, p. 481.

"In Hare's American Constitutional Law, vol. 2, c. 41, p. 906, this learned writer lays it down that: 'When a riot assumes such proportions that it cannot be quelled by ordinary means, and threatens irreparable injury to life or property, * * * arms may be used as in battle to bear down resistance, and, if loss of life ensues, the circumstances will be a justification. The measure does not, however, cease to be civil, or fall beyond the rules which apply when a house is entered in the night by burglars, or a traveler shoots a highwayman who demands his money. Nor will it change its character because the military are called in and the sheriff delegates his authority to the commanding officer. As Lord Mansfield showed in the debate on the Lord George Gordon riots in 1780, soldiers are subject to the duties and liabilities of the citizens although they wear a uniform and may like other individuals act as special constables or of their own motion for the suppression of a mob, and, if the staff does not suffice, employ the sword. The intervention of the military does not introduce martial law in the sense in which the term is understood under despotic governments and even been by some distinguished jurists, because agreeably to the same great magistrate and the settled practice in England and the United States they are liable to be tried and punished for any excess or abuse of power, not by the martial code, but under the common and statute law.'

"Running through these authorities and others that we have examined will be found the principle that the soldier is amenable to the civil authorities for his acts in violation of law; but that 'yet a soldier runs little risk in obeying any order which a man of common sense so placed would regard as warranted by the circumstances. And if the circumstances are such that the command may be justifiable, he should not be held guilty for declining to decide that it is wrong with the responsibility incident to disobedience unless the case is so plain as not to admit of a reasonable doubt.' Hare's Am. Con. Law, vol. 2, c. 41, p. 920; Dicey, Law of the Con., p. 285; *Commonwealth v. Shortall*, 206 Pa. 165, 55 Atl. 952. 65 L. R. A. 193, 98 Am. St. Rep. 759; *Luther v. Borden*, 7 How. 45, 12 L. Ed. 581; *Mitchell v. Harmony*, 13 How. 115, 14 L. Ed. 75; *Ex parte Milligan*, 4 Wall. 2, 18 L. Ed. 281; *McCall v. McDowell*, 1 Abb. (U. S.) 212, Fed. Cas. No. 8,673; *United States v. Clark* (C. C.) 31 Fed. 710; *Riggs v. State*, 3 Cold. (Tenn.) 85, 91 Am. Dec. 272; *Christian County Court v. Rankin*, 2 Duv. (Ky.) 502, 87 Am. Dec. 505; *Hogue v. Penn*, 3 Bush (Ky.) 663, 96 Am. Dec. 274.

"With the liability of the soldier under the military law for refusing to obey the orders of his superior officer, we are not much concerned in disposing of the matter before us. Whether the military law can punish him or not for disobedience of an order that if executed would involve him in civil or criminal liability is a question that it is well to postpone answering until it comes up. But what orders of his superior a soldier may obey and be exempt from civil liability, and what orders his obedience of will subject him to suit, are before us and must be disposed of. Upon this point, after mature consideration, we have reached the conclusion that *any military order, whether it be given by the Governor of the State or an officer of the militia or a civil officer of a city or county, that attempts to invest either officer or private with authority in excess of that which may be exercised by peace officers of the state is unreasonable and unlawful; and, if it is obeyed, the officer or private giving obedience subjects himself to such punishment and liability as the penal and civil laws of the state might inflict against a private individual guilty of similar transgressions of the law or the rights of the citizen.* [Italics ours.] We feel at liberty to thus define the limits within which soldiers may lawfully act, *because all the authorities agree that the courts may at the instance of any person who has been aggrieved or on behalf of the commonwealth inquire into their acts and doings and determine whether or not they have been guilty of any conduct that would subject them to liability or punishment.* [Italics ours.] The only difference between our ruling and that obtaining in the authorities cited is that we define more precisely than they do what orders a soldier is justifiable in executing, and hold as a matter of law that these orders are confined to such as a peace officer in the discharge of his duty might execute. In respect to these orders, the powers of the military and local civil officers of the state are identical. What one cannot do, neither can the other; what one may do, so may the other. The soldier has the same measure of protection and is subject to the same liability, whether he is acting under the orders of a military officer, independent of the local civil authorities, or is acting under immediate direction of these authorities. Neither has the right to give any orders or directions except those that a peace officer of the state might rightfully execute; and, if the soldier does only what a peace officer may do, then he is entitled to the immunity afforded peace officers in the performance of their duty. This rule of conduct is of course not free from objection, but upon the whole we

think it furnishes a reasonable guide for the militia, and describes with as much accuracy as conditions will permit the lines within which they may act with safety and beyond which they may not go without peril. Its observance will protect the quiet and orderly citizen from disturbance and arrest and leave the lawbreaker to be dealt with as his conduct deserves."

See, also, *Manley v. State* (Tex. Cr. App.), 137 S. W. 1137.

It will be observed that the Kentucky Court of Appeals in the foregoing case says that "all the authorities agree that the courts may at the instance of any person who has been aggrieved or on behalf of the commonwealth inquire into their acts and doings and determine whether or not they have been guilty of any conduct that would subject them to liability or punishment."

When the convention was in session for the purpose of framing a Constitution for the proposed state of Oklahoma, the holding of the Supreme Court of the state of Colorado, *in re Moyer, supra,* was fresh in their minds. In view of that holding, section 10 of article 2 (Bill of Rights) of the Constitution, which provides that "the privilege of the writ of *habeas corpus* shall never be suspended by the authorities of this state," was incorporated in said Constitution, evidencing a settled purpose as expressed in section 14, article 2, *supra,* that "the military shall be held in strict subordination to the civil authorities," and that the military officer or member of the militia shall be as much amenable to the process of the courts as any peace officer of the state. Under our Constitution it is the duty of the courts to announce the law and leave the responsibility of the enforcement of the law to the executive department.

It is clear that the Governor had no authority to issue any proclamation other than the one that was required immediately after the election, which was necessary to be issued before any contest could be instituted in this court. If the board of county commissioners, acting under said judgment, arranged for a courthouse in a certain designated place in Jay, and caused the county officers to move there, and the Governor, in the performance of his official duty, believed that the courthouse, under the law,

should be located on a certain designated ten acres, he should have required the county attorney of that county, who is the executive law officer of the district court of that county, or the Attorney General of this state, to bring a suit in the district court in the name of the state to cause said county officials to remove the seat of the county government to said ten acres. The Governor of this state is not permitted by our Constitution, in the enforcing of the law by means of the militia, to become both the executive and judicial department of the state.

Having this view of the law at the time this application for a restraining order was presented, and the question being raised as to whether the courthouse might be located at any point within Jay, its limits having been extended since the election was had to designate the county seat, and then believing that we had jurisdiction to decide that question, a restraining order was issued in order that the question might be heard, and, after a hearing, that the same should be determined.

As to whether the seat of government can only be located upon the original ten acres, in view of the conclusion hereinafter reached, we express no opinion. However, we have concluded that this judgment, declaring Jay to be the county seat, is self-executing; that no process is to be issued from this court to enforce that judgment; that it is the duty of the board of county commissioners to provide for a courthouse at such place, and it is the duty of the county officers to remove there. If they have not acted pursuant to this decree and as the law requires them to act, mandamus is the remedy in a proper tribunal having jurisdiction to require them so to act.

It follows that this court had not jurisdiction of the original action, and, not having jurisdiction, the restraining order issued against the respondent was void, and, that being the case, said respondent is not guilty of contempt. The respondent is therefore discharged.

HAYES, KANE, and DUNN, JJ., concur. TURNER, C. J., dissents as to that part of the opinion holding that this

court was without jurisdiction to issue the restraining order, and for that reason it was void and the respondent not guilty of contempt, but concurs as to the balance of the opinion.