# CHARLESTON.

Ex Parte A. D. Lavinder *et al.*

Nos. 4358, 4359, 4360.

Submitted June 9, 1921.    Decided June 14, 1921.

Opinion filed September 13, 1921.

1. Martial Law—*Cannot Obtain in Absence of Military Operations.*

   Martial law operating, in the government of territory, as a substitute for the civil law or as an addition thereto, so as to restrict the liberties of citizens and augment the powers of officers, is an incident of military operations and of actual military occupation of the territory so governed; wherefore it cannot obtain in the absence of such operations and occupation.    (p. 715).

2. Same—*Existence of State of War nor Governor's Proclamation Declaring it, Not Alone Sufficient to Inaugurate Martial Law.*

   The existence of war between a state and citizens of a portion of its territory, arising out of an insurrection, does not of itself inaugurate martial law in such territory, nor does the proclamation thereof by the Governor put it in operation. Nor does the fact, nor the proclamation nor both afford any constitutional basis for a proclamation of martial law in such territory, unless nor until a military force is put into the field for administration and enforcement thereof.    (p. 716).

3. Same—*Governor Cannot Enforce Martial Law by Means of Civil Authorities.*

   In such case it is not within the constitutional power of the Governor to inaugurate and enforce martial law within such territory, by means of the civil authorities acting under

88 W. Va.

the direction of himself and a military officer sent into it by him for the purpose. A mere military coloring of administration is insufficient. (p. 716).

4.   SAME—*Sections 5 to 9 Inclusive, Chapter 14 of the Code, Operative Only in Time of Actual War.*

Sections 5 to 9, inclusive, of ch. 14 of the Code, are operative only in a time of actual war, and, under them, citizens cannot be arrested and detained. except in the time of such war, for acts not constituting offenses under the civil law, though prescribed and forbidden by executive regulations, rules and orders set forth in proclamations of war and martial law. (p. 719).

(MILLER, JUDGE, dissenting).

Petitions for writ of *habeas corpus* by A. D. Lavinder against William J. Hatfield, Sheriff of McDowell County, and Mount Woolford and Frank Ingram against A. C. Pinson, Sheriff of Mingo County.

*Petitioners discharged.*

*Harold W. Houston,* for petitioners.

*E. T. England,* Attorney General, *Charles Ritchie* and *R. Dennis Steed,* Assistants Attorney General, and *S. B. Avis,* for respondents.

POFFENBARGER, JUDGE:

Alleging illegal restraint and deprivation of his liberty by the Sheriff of McDowell County, proceeding under orders of the Acting Adjutant General of West Virginia, A. D. Lavinder obtained from two of the judges of this court, acting in vacation, a writ of *habeas corpus ad subjiciendum,* requiring the production of his body in court, at the City of Charleston, at a special term, for judicial inquiry and determination as to the validity of his imprisonment. Upon similar complaints, Mount Woolford and Frank Ingram obtained such writs returnable at the same time and place and requiring the Sheriff of Mingo County to produce their bodies before the court for like inquiry and determination.

Each of said parties was held as a military prisoner, for infraction of a rule or order contained in a proclamation issued by the Governor of the State, declaring the existence of a state of war, insurrection and riot in the County of Mingo, and purporting to inaugurate martial law throughout the

whole of said county and to require from all of its inhabitants and other persons within its limits, obedience to certain orders, rules and regulations prescribed in said proclamation, exceeding in their requirements, those of the common and statute laws, some of which, unless made exceptional on the ground of necessity and thus brought within the Constitution, contravene provisions of that instrument.

Under authority conferred by law, Lavinder had carried a pistol in Mingo County, he having been duly licensed so to do by an order of a competent court of Kanawha County and the license so granted him being state-wide in its operation. His carriage of the pistol under such circumstances was treated as an infraction of one of the martial law regulations inhibiting the possession and carrying of arms in the county; and, therefore, as sufficient ground for his arrest and detention pending suppression of the insurrection. Immediately upon his arrest, he was committed to the custody of the Sheriff of Mingo County, by an order of the Acting Adjutant General and then, by a like order, transferred to the custody of the Sheriff of McDowell County, on account of the crowded condition of the Mingo County jail. Woolford was seized and likewise detained in the Mingo County jail, for having had pistol cartridges in his possession; and Ingram, for passing up and down through a tent colony of striking coal miners, contrary to orders given under said proclamation. None of these acts constituted a violation of any civil law, but all were prohibited by the Governor's rules and regulations, as interpreted and applied by his agent in the alleged military district, the Acting Adjutant General.

Admittedly, there was no actual military organization or force representing the state government, in Mingo County, at the time of the arrests. The Acting Adjutant General, holding a military commission, was on the ground and was directing the civil authorities of the county, the sheriff, constables, justices, policemen and the *posse comitatus,* but they were not enrolled, enlisted nor organized as a military force. Under the law, the Governor had a potential military force in the state and county, the unorganized militia; but, being unenrolled, uncalled and unorganized, it could not have been

88 W. Va.

deemed to be an actual military force, nor treated as such. Although officially declared to be in a state of war, the county was not occupied by any military force of the state. The enterprise was an attempt to put into effect and enforce military or martial law, by merely civil agencies. The presence of a military officer and action of the civil authorities, under his direction, constituted no more than mere military color in the situation and procedure.

The substitution of military, for the civil law, in any community, is an extreme measure. Socially, economically and politically, it is deplorable and calamitous. Its sole justification is the failure of the civil law fully to operate and function, for the time being, by reason of the paralysis or overthrow of its agencies, in consequence of an insurrection, invasion or other enterprise hostile to the state and resulting in actual warfare. And then such substitution at any place within the state cannot extend beyond the limits of the theater of actual war. *Nance and Mays* v. *Brown,* 71 W. Va. 519; *In re Jones et al.,* 71 W. Va. 567. Martial Law within the territory of a country at war with another, or with rebellious citizens or subjects in possession of a part of its own territory, is not a necessary incident or consequence of the existing state of war. A concrete illustration of this proposition is found in the late World War. Though there were millions of men under arms in the United States, not a foot of its territory was subjected to martial law, on the ground of the existence of the state of war between this country and certain European governments; nor, under principles declared in *Ex parte Milligan,* 4 Wall. (U. S.) 2, could it have been, because there was no actual warfare in this country,— no fighting, no battle lines, no area in which troops were assembled or moved to-and-fro, in the conduct of, or preparation for, immediate or probable combat. In the great Civil War, portions of the country lying without the theatre of actual war, as here indicated, were constitutionally immune from martial law. *Ex parte Milligan,* cited. It is perfectly manifest, that the proclamation of war did not, *ipso facto,* nor *ex proprio vigore,* inaugurate martial law in Mingo County.

The Governor's attempt to inaugurate it and put it into effect in that county, in the manner hereinbefore described, was clearly futile and inoperative. The irresistible logic of the precedents already cited and of all others bearing upon the subject is that martial law is an incident of military operations within the area of actual, not merely theoretical, warfare. Being only an incident of actual warfare, such warfare is essential to its existence; and, being also a mere incident of actual military occupation of territory, an army in the field is equally essential and indispensable. No precedent, text nor judicial opinion found in the books accords to martial law of the kind now under consideration a wider scope or larger function than that just indicated. Upon the theory of the procedure under which these arrests were made, a citizen of revolting or enemy territory might be guilty of many infractions of martial law, long before accrual of the power to make it effective. As an incident of the Civil War, that theory, if applied, might have piled up against a citizen of Georgia, a three or four years' accumulation of offenses under federal military regulations of which he had no knowledge, and required him to suffer imprisonment or other punishment for them, on the arrival of federal troops within the state. There could have been no American martial law in Cuba, Porto Rico, the Philippine Islands or Germany, until the American troops actually occupied those countries, and then it was limited to the territories in actual occupation. It is a purely military measure and its administration a strictly military function. To say the military chief may prescribe it and then devolve its enforcement upon the civil officers of the territory involves a serious departure from logic as well as a contradiction in terms. It is as truly military in its administration as in its origin, nature and institution or proclamation.

The authority of the Governor to institute and enforce it, under circumstances warranting such action, accorded to him by certain decisions of this court, to which reference has been made, is found in sec. 12 of Art. VII of the Constitution, only by construction of the terms used therein, in connection with other provisions of the organic law. That section makes him

commander-in-chief of the military forces of the state and expressly empowers him to call out the same to execute the laws, suppress insurrection and repel invasion. Power to suppress insurrection and repel invasion by the use of the military forces of the state impliedly carries power to accomplish those purposes in the recognized modes of warfare, which include martial rule within the area of actual hostilities. In other words, the Governor, being expressly authorized to conduct military operations for suppression of insurrection and in resistance of invasion, is impliedly authorized to conduct such operations in accordance with the usages and customs of war, and so has all the powers recognized as being incident to the office of commander-in-chief of any army engaged in such enterprises. This is a reasonable and fair interpretation of the terms of the section above referred to. Administration and enforcement of martial law by civil agencies could not be brought within the terms of that section, in any way. Moreover, specification of one method of effecting a result is regarded, in constitutional construction, as an implied exclusion of all others, even though they may be deemed to be more convenient or efficacious than the one designated. "The rule, that when an instrument gives a power, it also gives, by implication, the means necessary to its exercise, is intended to render available those grants of power, which, without its application, would be inoperative and nugatory, by reason of the means necessary to its exercise not being also provided. But when the means of enforcing a given power are furnished by the law, the rule does not apply." *Field* v. *People,* 2 Scam. (Ill.), 79, 85. Of course, this holding is limited to *suppression* of insurrection and *repulsion* of invasion, terms necessarily implying the use of force. If insurrectionists or foreign enemies can be dissuaded from their purposes by persuasion or other peaceable methods, the Governor may employ them and need not resort to force. But, when the application of military force is necessary, he is limited to the use of a military organization, in the effectuation of his purpose. He cannot enlarge the powers of the civil officers, nor restrict the legal rights of citizens, by way of exercise of his power to achieve certain

purposes by the use of a military force. In other words, he cannot by a mere order convert the civil officers into an army and clothe them with military powers, for the purpose of suppressing an insurrection or repelling an invasion. He can raise an army only in the manner prescribed by law, and his military authority can be exerted in respect of things authorized to be done with the military forces, only by means of an army.

This somewhat technical view of the subject is sustained by broader and more practical consideration. Martial law is a drastic and oppressive system. Under it, the rights, privileges and liberties ordinarily possessed and enjoyed by citizens are greatly restricted and abridged and the powers of the military officers are infinitely larger than those conferred upon the civil officers. Hence, it ought not to be put into effect except upon occasions of dire and inexorable necessity. Limitation of the power of the Governor to invoke and apply it only on occasions of actual warfare and within the area of actual hostilities, renders it impossible for him to set aside the civil laws and rule by his practically unrestrained will, under any other circumstances. Such a construction is not unreasonable and it is highly necessary in the legal sense of the term. If he could proclaim martial law and enforce it by employment of the civil authorities, he would be often importuned to do so, upon facts and circumstances wholly insufficient in reason to warrant such procedure; and, in some such instances, he might be induced by misapprehension or misrepresentation, to yield to such importunities. The necessity and application of actual military force, as prerequisites, afford a reasonably certain basis, standard or test by which he can always determine the propriety of resort to this high power, as well as obtain immunity from the embarrassment of groundless appeals for abridgement of the legal rights of citizens and enlargement of the powers of the civil officers.

Power in a chief magistrate, to effect such results under ordinary circumstances, would be suggestive of the despotism of unrestrained monarchial government, complete abolition, inhibition or preclusion of which is one of the chief aims or purposes of constitutional popular government. The framers

of the federal constitution were particularly careful to provide against it by many of the provisions of that instrument. Both the federal and the state constitutions withhold it from the legislature as well as the executive. The war power only was excepted. For an occasion of such gravity, it was deemed inadvisable to attempt to define the powers of government, by any constitutional provision, wherefore the usages and customs of war constitute its limitations. Enlargement of that exception would amount to an undermining of a cornerstone of constitutional government. It is so high, mighty and dangerous in character that it must be rigidly and strictly kept within clearly defined limits, even though they may seem to be arbitrary and technical.

In the light of the same general principles, we interpret secs. 5 to 9, inclusive, of ch. 14 of the Code, authorizing arrest, in time of war, of persons giving aid, support or information to the enemy or insurgents, or combining or conspiring together to aid or support any hostile action against the United States or this state. Such high and extraordinary power was not intended to be conferred, unless nor until actual warfare is made manifest by the presence of an army in the field. The power is given by way of aid in the actual suppression of insurrection or resistance of invasion. It cannot be wielded except ''in time of war.'' That does not mean theoretical or technical war. It means actual war. Ordinarily, a declaration of war is followed immediately by the movement of troops for attack or defense. The statute must operate according to the plain and ordinary meaning of its terms, not an obscure, exceptional or strained interpretation. Besides, until the declaration of war is carried into effect by actual military or naval operations, there is no such an emergency as justifies the possession or exercise of such extraordinary powers as the statute confers in time of war. Lack of such a limitation as we recognize and here state would open the door to the possibility of abuses thereof, well calculated to impair and weaken the very foundations of constitutional government. Though we cannot assume that any chief magistrate would ever set up a merely pretextual state of war, as color or ground for seizure of extraordinary powers

inconsistent with, and subversive of, liberty, the bare possibility of such action, under a loose interpretation of the statute, amply suffices for adoption of the strict construction we give it. Besides, as has been stated, it harmonizes with the general principles above adverted to and carries them into effect.

Upon these principles and conclusions, the returns to the writs were held insufficient and the prisoners discharged.

*Petitioners discharged.*