### CONSTANTIN et al. v. SMITH et al.
### No. 365.

District Court, E. D. Texas, Tyler Division.
Feb. 18, 1932.

Bailey, Nickels & Bailey, of Dallas, Tex., for complainants.

Elbert Hooper and Fred Upchurch, Asst. Attys. Gen., for respondents Attorney General of Texas and Railroad Commission of Texas.

Paul D. Page, Jr., of Houston, Tex., and Dan Moody and E. F. Smith, both of Austin, Tex., for other respondents.

T. W. Gregory and Samuel B. Dabney, both of Houston, Tex., amici curiæ.

Before HUTCHESON, Circuit Judge, and GRUBB and BRYANT, District Judges.

HUTCHESON, Circuit Judge (after stating the issues and facts as above).

This suit, involving the exercise of the judicial power of the United States to restrain by injunction R. S. Sterling, W. W. Sterling, and Jacob F. Wolters, holding the offices respectively of Governor of the state of Texas, adjutant general, and brigadier general, from, under the claim of military necessity, limiting the production from plaintiffs' wells in the East Texas oil field where the Governor has declared martial law, presents, in a fundamental way, questions of executive and judicial power.

The case is one of wide interest and concern. It has been thoroughly and adequately briefed by counsel of distinction and ability. Our disposition of it has been greatly aided by the candor and excellence of the briefs filed. Plaintiffs' counsel have filed one brief, defendants' counsel two; one brief has been filed amicus curiæ in support of, one against, the martial law jurisdiction asserted. The arguments, as befits the subject, have taken wide range; in the grand manner they have discussed the great themes of liberty under law, separation of powers, the rights of man, the sovereign powers of states, the Federal Constitution as the supreme law of the land. Plaintiffs' brief reciting a tale of ancient wrongs at the hands of tyrannous executives professes to see in the actions and purposes of defendants here despotism and tyranny walking again to perpetrate old outrages under new pretenses. Both plaintiffs and defendants conjure here the specter of usurpation of powers, judicial and execu-

234

tive. We do not start at such specter conjuring on either side. The judicial branch has neither purse, nor sword, nor ministers to execute its will. Its decrees take their force alone from the purity and the justness of its judgments; while the executive in our time, though strong in theory, is of all men most bound to show a decent respect to the opinions of mankind, and may not ever be any stronger than the gathered force of public opinion.

It is entirely evident, however, that, unless we keep firmly in mind that this is a cause in court involving real rights, and real issues, in which the judgment must be, not what one wills, but what one must, not a philosophical debate in which the judges may decide not what is, but what ought to be, the temptation to match forensic with judicial opinion will not only make this opinion overlong, but will add to the already too long list of so-called martial law opinions, most of them the bitter fruit of industrial passion, still another one so concerned with general principles that it says far more than it decides. Courts of equity should and must decide cases as private, not as public, as real, not as abstract, controversies, and determine them accordingly. California v. San Pablo & T. R. Co., 149 U. S. 308, 13 S. Ct. 876, 37 L. Ed. 747; Mills v. Green, 159 U. S. 654, 16 S. Ct. 132, 40 L. Ed. 293; United States v. Hamburg, 239 U. S. 475, 36 S. Ct. 212, 60 L. Ed. 387.

We turn then to a consideration of this case, as it is, a private controversy in which plaintiffs, complaining of the illegal deprivation of their property, invoke the chancery powers of this court to prevent it.

We examine the questions propounded and the authorities cited in the light, not of abstractions, but of the case before us, first premising what the case is not; then what it is.

Stripped of the involvement with which its contentions course has invested it, and considered as it now presents itself for decision, it is not a proceeding for habeas corpus, as Re Milligan, 4 Wall. 2, 18 L. Ed. 281, was, nor one under 28 USCA § 41, subd. 14, section 24 (14) of the Judicial Code, to redress the deprivation of civil rights, as were the federal cases of Moyer v. Peabody (C. C.) 148 F. 870; Id., 212 U. S. 78, 29 S. Ct. 235, 53 L. Ed. 410; United States v. Wolters (D. C.) 268 F. 69; United States v. Fischer (D. C.) 280 F. 208; United States v. Adams (D. C.) 26 F. (2d) 141; nor is it a petition for writ of habeas corpus, as

were Commonwealth v. Shortall, 206 Pa. 165, 55 A. 952, 65 L. R. A. 193, 98 Am. St. Rep. 759; In re Moyer, 35 Colo. 159, 85 P. 190, 12 L. R. A. (N. S.) 979, 117 Am. St. Rep. 189; Ex parte Lavinder, 88 W. Va. 713, 108 S. E. 428, 24 A. L. R. 1178; In re Boyle, 6 Idaho, 609, 57 P. 706, 45 L. R. A. 832, 96 Am. St. Rep. 286; Ex parte Jones, 71 W. Va. 567, 77 S. E. 1029, 45 L. R. A. (N. S.) 1030–1058, Ann. Cas. 1914C, 31; State ex rel. Mays v. Brown, 71 W. Va. 519, 77 S. E. 243, 45 L. R. A. (N. S.) 997, Ann. Cas. 1914C, 1; Ex parte McDonald, 49 Mont. 454, 143 P. 947, L. R. A. 1915B, 998, Ann. Cas. 1916A, 1166. It is not a suit for damages, as were Herlihy v. Donohue, 52 Mont. 601, 161 P. 164, L. R. A. 1917B, 702, Ann. Cas. 1917C, 29; Bishop v. Vandercook, 228 Mich. 299, 200 N. W. 278; Mitchell v. Harmony, 13 How. 115, 14 L. Ed. 75; Franks v. Smith, 142 Ky. 232, 134 S. W. 484, L. R. A. 1915A, 1141, Ann. Cas. 1912D, 319; Luther v. Borden, 7 How. 1, 12 L. Ed. 581; Allen v. Gardner, 182 N. C. 425, 109 S. E. 260, 261. It is not a case like Martin v. Mott, 12 Wheat. 19, 6 L. Ed. 537; Chapin v. Ferry, 3 Wash. 386, 28 P. 754, 15 L. R. A. 116; Sweeney v. Commonwealth, 118 Ky. 912, 82 S. W. 639, involving solely the question of the right in one case of the President, in the others of the Governor, to call troops out. Nor is it even, so far as this three-judge court is concerned with it, a contempt case, like Fluke v. Canton, 31 Okl. 718, 123 P. 1049, for the disobedience of an injunction. It is not a case like Hartranft's Appeal, 85 Pa. 433, 27 Am. Rep. 667, of an effort of a state grand jury to prosecute an inquiry into the public actions of the Governor in using military force to suppress an insurrection. Nor does the case in any manner involve a general inquiry into or an effort to restrain the general power of the Governor to call out troops or to take such actions generally with them as he may see fit. The case involves merely the right of a citizen to relief against acts in deprivation of his property, and the questions of martial law and the power of the Governor come up as incidental to the inquiry, and are drawn into it and affected by it only in so far as it is necessary to settle that inquiry.

It is perfectly clear that, unless the defendants can maintain their proposition, that they are ad hoc the state, and therefore may not be sued, or that the declaration of martial law has superseded the Federal Constitution as the supreme law of the land, and during the time of its fiat continuance placed defendants above accountability to the courts, plain-

tiffs are entitled to equitable relief, for no clearer case of deprivation of rights inhering in private ownership of property under color of law can be imagined than is here occurring. It could not be, it is not contended that, under ordinary conditions, that is, martial law absent, a Governor and the militia could expropriate the management of private property, as they are now doing. It remains only to inquire whether the defendants because of the proclamations find themselves so situated as that a court of the United States may not exert its jurisdiction upon complaint against their actions to inquire into them, or, if it may, may not, under the undisputed facts obtaining, grant relief.

Looking first to defendants' contentions, we think it might reasonably be expected that, in support of pretensions so vast, of authority so absolute and uncontrolled as here asserted, of power in the executive of a state by fiat to suspend, not only the Constitution of the state, but of the United States, to the extent of depriving their courts of jurisdiction to inquire into and redress grievances, defendants would point to enabling constitutional provisions, state or national, or at least clear and convincing authority supporting their claim.

We have examined the constitutional provisions which they rely on. We have examined every authority cited by them. We have found none, we conclude that none exists which, as against the claim of deprivation of property, supports defendants' claim to immunity from judicial inquiry, and none which has even considered, much less declared, that a court of the United States may not, by injunction, prevent the deprivation of property such as is here occurring.

 Upon the first proposition advanced, that this is a suit against the state, and that as such it may not be maintained, the authorities overwhelm that this is a suit under the first subdivision of section 41, 28 USCA, section 24, subd. 1 of the Judicial Code, to redress the deprivation of property arising under the Constitution and laws of the United States (Holt v. Indiana Mfg. Co., 176 U. S. 70, 20 S. Ct. 272, 44 L. Ed. 374) and that as such it is not a suit against the state, but against persons in their individual capacities, to prevent them from enforcing statutes in themselves unconstitutional, or unconstitutional as attempted to be enforced and applied. That in such a suit, when it is found, that "an individual, acting under the assumed authority of a state, as one of its officers, and under color of its laws, comes into conflict with the superior authority of a valid law of the United States, he is stripped of his representative character, and subjected in his person to the consequences of his individual conduct. The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States." Ex parte Ayers, 123 U. S. 507, 8 S. Ct. 164, 184, 31 L. Ed. 216; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 S. Ct. 1047, 38 L. Ed. 1014; Ex parte Young, 209 U. S. 123, 28 S. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764; Yick Wo v. Hopkins, 118 U. S. 356, 6 S. Ct. 1064, 30 L. Ed. 220; Truax v. Raich, 239 U. S. 33, 36 S. Ct. 7, 60 L. Ed. 131, L. R. A. 1916D, 545, Ann. Cas. 1917B, 283; Greene v. Louisville & Int. R. R., 244 U. S. 507, 37 S. Ct. 673, 61 L. Ed. 1280, Ann. Cas. 1917E, 88; Mac-Millan v. Comm. (D. C.) 51 F.(2d) 400; McLeaish v. Binford (D. C.) 52 F.(2d) 151. In this suit plaintiffs invoke the exercise of the judicial power of the United States which, vested by the Constitution in its courts, extends to all cases of law and equity arising thereunder. La Abra Silver Mining Co. v. U. S., 175 U. S. 423, 20 S. Ct. 168, 44 L. Ed. 223; Kansas v. Colorado, 206 U. S. 83, 27 S. Ct. 655, 51 L. Ed. 956.

 No exertion of this power rests on clearer or more certain grounds than that of its chancery jurisdiction. It is exercised uniformly throughout the nation, unaffected by statutes, usages, or customs of the several states. It is properly commensurate with every right or duty declared or necessarily implied by and under the Constitution of the United States, and its jurisdiction to inquire into a cause and determine whether it presents a matter of equitable cognizance may not be infringed or impaired by the Constitution of any state or by any act or proceeding of the legislative, the executive or the judicial branch of a state. Truax v. Corrigan, 257 U. S. 334, 42 S. Ct. 124, 66 L. Ed. 254, 27 A. L. R. 375. Of the chancery jurisdiction no phase of it has a better settled basis, a more comprehensive and remedial scope than that which it employs to prevent persons, acting under the authority or color of state laws, from denying the due process and equal protection which the Fourteenth Amendment guarantees. This must necessarily be so, for, independent of each other in their respective spheres as are the state and federal governments, the Constitution of the United States is the supreme law of the land, and the courts of the United

States, as the repositories of federal judicial power, are compelled to and will assert and vindicate its supremacy, to protect the rights of individuals menaced by personal aggression masked under official power. United States v. Lee, 106 U. S. 208, 1 S. Ct. 240, 27 L. Ed. 171; Ableman v. Booth, 21 How. 506, 16 L. Ed. 169; Ex parte Ayers, supra; Terrace v. Thompson, 263 U. S. 214, 44 S. Ct. 15, 68 L. Ed. 255.

Defendants do not, they cannot, point to any provision of the Federal Constitution or statutes which exalts an officer of the state, when acting beyond his powers, above the authority of the courts of the United States; which subordinates the federal courts, acting within their spheres, to the authority of the officers of the state, or which permits anything to "be interposed between the individual and the obligation he owes to the constitution and laws of the United States, which can shield or defend him from their just authority, the extent and limits of which authority the government of the United States, by means of its judicial power, interprets and applies for itself." Ex parte Ayers, supra.

It follows that plaintiffs' suit as alleged, being one to restrain the officers of the state from enforcing against them, in a confiscatory way, the laws of that state on the ground that such laws or their enforcement are opposed to the Constitution of the United States, and particularly the Fourteenth Amendment thereof, this court, organized as a statutory court under 28 USCA § 380 (Judicial Code § 266), has undoubted jurisdiction to inquire into the merits of the cause, and to adjudicate in accordance with its merits. Authorities supra, and Oklahoma Natural Gas Co. v. Russell, 261 U. S. 292, 43 S. Ct. 353, 67 L. Ed. 659; Western & A. Ry. v. Commission, 261 U. S. 264, 43 S. Ct. 252, 67 L. Ed. 645.

We reject, then, as entirely without substance, contrary to the genius of the two governments, federal and state, and opposed to the very conceptions upon which this government was founded and has been maintained, the contention that any officer of a state, whether acting in a civil or a military capacity, whether executive, legislative, or judicial, can, by proclamation or otherwise, erect himself above the jurisdiction of the federal courts, withdraw his actions affecting private property from judicial inquiry, and insulate himself from judicial process and the consequences of disobedience to ju-

dicial decree. Ex parte Ayers, Ableman v. Booth, United States v. Lee, supra.

We come then to an examination of the case upon its merits, first inquiring what are the provisions of the State Constitution under which these great powers are claimed, and next, whether in this state, or in any other, any court, state or federal, has ever declared that persons in an industry dominated and taken over by the executive of a state for the purpose and with the result of controlling production, and kept under control, as this has been, for some six months, are powerless to obtain injunctive relief against such executive aggression because of the fact that the Governor has issued a proclamation of martial law, and is controlling the production of oil upon the asserted ground that it is necessary to do so in order to prevent persons, who would become enraged if production were not kept down to the figure they desire, from committing acts of incendiarism and violence.

The provisions of the Constitution on which defendants rely are:

Article 4 § 1: "The executive department of the state shall consist of a governor, who shall be the chief executive officer of the state."

Article 4 § 10: "* * * Shall cause the laws to be faithfully executed. * * *"

Article 4 § 7: "Shall be the commander-in-chief of the military forces of the state. * * * he shall have power to call forth the militia to execute the laws of the state, to suppress insurrection, repel invasion, and protect the frontier from hostile incursions by Indians or other predatory bands."

The Legislature has made the following provisions:

Article 5889: "Whenever any portion of the military forces of this State is employed in aid of the civil authority, the Governor, if in his judgment the maintenance of law and order will thereby be promoted may, by proclamation, declare the county or city in which the troops are serving, or any special portion thereof, to be in a state of insurrection."

Article 5834 provides: "The Governor may order the active militia, or any part thereof, to assist the civil authorities in guarding prisoners * * * or discharging other duties in connection with the execution of the law as the public interest or safety at any time may require."

Article 5778 provides: "The Governor

shall have power in case of insurrection, invasion, tumult, riot or breach of peace, or imminent danger thereof, to order into the active service of this State any part of the militia that he may deem proper."

Article 5830 provides: "When an invasion of, or an insurrection in, this State is made or threatened, or when the Governor may deem it necessary for the enforcement of the laws of this State, he shall call forth the active militia or any part thereof, to repel, suppress, or enforce the same."

It will be noted that nowhere, in either the Constitution or the statutes, is a state of war referred to, or the declaration of martial law authorized. It is nowhere provided that the Governor may institute it, or that he may in any manner, or under any circumstances, suspend the laws and deprive persons of access to the courts. Considering these provisions alone, we think the defendants' case fails for want of affirmative authority, in that the provisions they invoke do not contain the grant of power claimed.

But we do not rest our conclusion alone upon the silence of the Constitution in not granting the power, for it has by express provision withheld such power and prevented beyond peradventure, it being there implied. That the Governor may, in his discretion, call out the militia, the Constitution does indeed provide. That the Constitution has prohibited to the Governor the power by proclamation to suspend the Constitution and laws, the power to invest himself with a military character which will confer on him and the militia any extraordinary powers not given by the civil laws, or place them above the corrective reach of the courts as here contended, the Constitution of this state and the applicable authorities make perfectly clear.

Martial law, the law of war, in territory where courts are open and civil processes run, is totally incompatible with, it cannot coexist, with provisions such as are contained in article 1, Bill of Rights of the Texas Constitution.

Section 12: "The writ of habeas corpus is a writ of right, and shall never be suspended."

Section 13: "All courts shall be open."

Section 19: "No citizen of this state shall be deprived of life, liberty, property, privileges or immunities * * * except by the due course of the law of the land."

Section 24: "The military shall at all times be subordinate to the civil authority."

Section 28: "No power of suspending laws in this state shall be exercised, except by the legislature."

Having in mind the great issues out of which these constitutional provisions grew, the courts of Texas have never faltered in straightly upholding them. Men learn but to forget, to learn and forget again. Sometimes they learn at such cost of shame and sorrow, of bitterness and despair, that graven on their hearts the lessons lie, deep beyond forgetting. At such times, men yearning toward their posterity write these lessons down, as imperishably as they may, that, standing as the Lord's remembrancers, they may save their children from like passion and travail. Of this kind are the constitutional provisions above set out. They were written into the fundamental law as direct inhibitions upon the executive, by men who had suffered under the imposition of martial law, with its suspension of civil authority, and the ousting of the courts during reconstruction in Texas. These provisions had their origin under practically the same conditions as those, which, in 1689, wrote limitations upon the power of the crown to suspend the laws. Their authors had petitioned the Congress of the United States in vain for relief. In every convention, in every gathering assembled, protesting the suppression of free speech, the interference with the processes, the judgments, the decrees of courts, these men had denounced martial tyranny, and sought relief against it, and, when they met to adopt the Constitution of 1876 which still obtains, they determined to, and they did, so write the fundamental law that such deprivations of liberty might never again occur.

 One of counsel for defendants urges that here is no case of suspension of laws, no case of deprivation of due process. That here is due process, the exertion of the power of police. That the exercise of such power inherent in government violates neither the Constitution of the state nor of the United States. The argument begs the question.

Certainly, if the actions of the Governor and of his subordinates here complained of are valid exercises of the police power of the state, they are not contrary to, they accord with, they do not violate, they conform to, the law. On the contrary, if they represent attempts to exercise police power not conferred upon the Governor, they are invalid under both Constitutions. "The police power is subordinate to the Constitution, as

is every other power of the government." It may be exercised only when and by whom the Constitution authorizes its exercise, and in the judicial branch of the Government alone resides the power to determine whether it is being so exercised. Stockwell v. State, 110 Tex. 551, 221 S. W. 932, 934, 12 A. L. R. 1116, Spann v. City of Dallas, 111 Tex. 350, 235 S. W. 513, 19 A. L. R. 1387. Without variableness, neither shadow of turning, the courts of Texas down to this very day mindful of the occasion, the purpose, and the meaning of these constitutional safeguards, keeping faith with them, have kept the Constitution paramount. Arroyo v. State (Tex. Cr. App.) 69 S. W. 503, 504; Brown Cracker Co. v. Dallas, 104 Tex. 294, 137 S. W. 342, Ann. Cas. 1914B, 504; Box v. Newsom (Tex. Civ. App.) 43 S.W.(2d) 983; Stockwell v. State,[1] Spann v. City of Dallas,[2] Crossman v. City of Galveston, 112 Tex. 303, 247 S. W. 810, 26 A. L. R. 1210.

When the Governor calls out the troops in Texas, he calls them out, not as a military, but as a civil officer. Their powers and duties are derived from, they must be found in, the civil law. At no time and under no conditions are their actions above court inquiry or court review.

This does not mean, of course, that the military, acting as peace officers, may not in emergencies exercise summary power. They may, but so may peace officers, and even civilians. "Measures are sometimes necessary under the police power, that are severe." Moyer v. Peabody (C. C.) 148 F. 870, 876. But the measures referred to in that opinion were not military, they were civil measures taken in and justified by necessity. If we were without direct authority for these views,

[1] The police power is subordinate to the Constitution as is every other power of government. If this were not so, the result would be to subject the citizen's property solely to executive authority, putting it beyond the protection of the courts and depriving the courts of their essential power to determine what, under the written law, was lawful and what was not. Declaring the law of the land and adjusting property rights accordingly. Stockwell v. State.

[2] The substantial value of property lies in its use. If the right to use be denied, the value of the property is annihilated and ownership is rendered a barren right. The police power is a grant of authority from the people to their governmental agents. In its nature it is broad and comprehensive. While this is true, it is only a power, it is not a right. The powers of the government under our system are nowhere absolute. The fundamental rights of the people are inherent, and cannot be yielded to governmental control. Constitutional power can never transcend constitutional rights.

The police power is founded in public necessity, and only public necessity can justify its exercise. Spann v. City of Dallas, supra.

they would commend themselves to us as the only ones in accord with the genius of a government like ours. The view we take, however, has received positive and authoritative sanction, first in the courts of Kentucky, the "dark and bloody ground," where men have learned both to love and to know liberty, and by adoption afterwards, in Montana, North Caroline, Michigan and Oklahoma. Franks v. Smith, 142 Ky. 232, 134 S. W. 484, L. R. A. 1915A, 1141, Ann. Cas. 1912D, 319, lays down, we think, with precision and power, the rights of the Governor of a state, in the calling out and use of the militia. His unquestioned right to call it out is conceded. That his and the militia's status when called out is that of civil officers, whose only power must be found in civil laws, and that they are always subject to those laws, is declared in no uncertain terms. There the difference between the unquestioned right of the Governor to call out the militia, which all the authorities concede, and his right to erect himself and them above the law, giving them superpowers, is set out. That court in terms declared that it rejected the doctrine, as applied to Kentucky, announced in Re Moyer, 35 Colo. 159, 85 P. 190, 12 L. R. A. (N. S.) 979, 117 Am. St. Rep. 189; Commonwealth v. Shortall, 206 Pa. 165, 55 A. 952, 65 L. R. A. 193, 98 Am. St. Rep. 759, that civil emergencies requiring the calling out of troops may be declared to be a state of war, and a military government may then ensue. Upon those points it said: "It must nevertheless be kept in mind that in its exercise [of the power to call out troops] the governor acts in his capacity as a civil officer of the state and not as commander in chief of its army. As the chief civil magistrate of the state, he calls out and must direct in accordance with law the movements and operations of the military forces. 'The military shall be at all times and in all cases in strict subordination to the civil power.' It is so written in section 22 of the Bill of Rights. We have not, and cannot have, in this state a military force that is not and will not be subordinate to the civil authorities. The military cannot in any state of case take the initiative or assume to do anything independent of the civil authorities. Ours is a government of civil, not military, forces. The militia in active service and in every emergency that arises in such service is subordinate to the civil power. The soldier and the citizen stand alike under the law. Both must obey its commands and be obedient to its mandates. * * *" Page 242 of 142 Ky., 134 S. W. 484, 488. "We are not

willing to concede that in any exigency that may arise the military is superior to the civil authorities. * * * Nor do we believe that the time will ever come when the military forces of the state, acting under and in obedience to the civil laws of the state, will not be able to control under the authority conferred by these laws any situation that may present itself." Page 243 of 142 Ky., 134 S. W. 484, 489. "After mature consideration, we have reached the conclusion that any military order, whether it be given by the Governor of the state or an officer of the militia * * * that attempts to invest either officer or private with authority in excess of that which may be exercised by peace officers of the state is unreasonable and unlawful. * * * " Page 251 of 142 Ky., 134 S. W. 484, 492. We hold as a matter of law that these orders [of the military] are confined to such as a peace officer in the discharge of his duty might execute. * * * What one cannot do, neither can the other; what one may do, so may the other." Page 251 of 142 Ky., 134 S. W. 484, 492. Again: "On the other hand, to say that the state militia acting in obedience to military orders may commit any act that may suggest itself to the commanding officer as being necessary to restore peace and quiet, although such act might be a greater violation of law than was committed by the person it was visited upon, would place the militia above the civil authorities, and give to the soldier power not conferred upon the civil officer charged with the duty of enforcing the law. The command of the officer would take the place of the statute, and there would be no limitation upon his conduct except such as his judgment and discretion might dispose him to adopt. We can find no warrant, either in the Constitution or statute * * * for investing the military forces of the state with arbitrary power like this." Page 245 of 142 Ky., 134 S. W. 484, 490.

And finally, pointing to the full power existing under the statutes of Kentucky and at common law in civil officers to meet emergencies, it declares that there is no occasion for, there can never be, the erection in any part of Kentucky of a military government, except where an actual war between contending armies is being waged.

This case has been accepted as authority, its views fully quoted and applied, in Fluke v. Canton, 31 Okl. 718, 123 P. 1049; Bishop v. Vandercook, 228 Mich. 299, 200 N. W. 278; Ex parte McDonald, 49 Mont. 454, 143 P. 947, 948, L. R. A. 1915B, 988,

Ann. Cas. 1916A, 1166; Allen v. Gardner, 182 N. C. 425, 109 S. E. 260. Recognizing as it does, the universally accepted view that "martial law is the law of actual military necessity in the actual presence of war. It is administered by the general of the army, and is in fact his will." United States v. Dickelman, 92 U. S. 526, 23 L. Ed. 742. "Martial law is founded on paramount necessity. It is the will of the commander of the forces. In the proper sense, it is not law at all." In re Ezeta (D. C.) 62 F. 972, 1002. "The will of the military chief * * * is, subject to slight limitations, the law of the military zone." State v. Brown, 71 W. Va. 519, 77 S. E. 243, 244, 45 L. R. A. (N. S.) 999, Ann. Cas. 1914C, 1. It declares that the Governor of a state may not, by proclamation, bring about such a condition of civil anarchy. It but declares and reaffirms the doctrine fixed beyond cavil and for all time by the Milligan Case, that martial law and civil law are mutually contradictory; they may not coexist. That martial law cannot exist where there is no real state of war, where the ordinary tribunals are functioning and orderly courts are run. That, under Constitutions like ours, in times of peace such military dictatorships may not be established by executive fiat.

We accept these principles in their fullest implications as principles obtaining in Texas under her Constitution and laws. We hold with the Supreme Court of Montana, in Re McDonald, 49 Mont. 454, 143 P. 947, 954, L. R. A. 1915B, 988, Ann. Cas. 1916A, 1166, that, under the Constitution of Texas, courts may not be closed, or their processes interfered with by military orders, that "courts cannot be ousted by the agencies detailed to aid them; nor can their functions be transferred to tribunals unknown to the Constitution"; and with that court in Herlihy v. Donohue, 52 Mont. 601, 161 P. 164, 166, L. R. A. 1917B, 702, Ann. Cas. 1917C, 29," "the Governor is at all times amenable to the Constitution and laws of the state. They are the charters of his powers, and in them he must find the authority for his official acts." And that, "while at times, within the narrow limits of actual and pressing necessity, private property may be taken and destroyed for the public good, in every instance where such right has been exercised and questioned, the decision upholding the right makes it clear beyond controversy that only the most overriding necessity will justify or excuse;" with the Supreme Court of West Virginia, in Ex parte Lavinder, 88 W. Va. 713, 108 S. E. 428, 430, 24 A. L. R. 1178: "Mar-

tial law is a drastic and oppressive system. Under it the rights, privileges, and liberties ordinarily possessed and enjoyed by citizens are greatly restricted and abridged, and the powers of the military officers are infinitely larger than those conferred upon the civil officers. Hence, it ought not to be put into effect except upon occasions of dire and inexorable necessity. Limitation of the power of the Governor to invoke and apply it only on occasions of actual warfare and within the area of actual hostilities renders it impossible for him to set aside the civil laws and rule by his practically unrestrained will, under any other circumstances."

We agree with Judge Symes in United States v. Adams (D. C.) 26 F.(2d) 141, 145, that, if the Governor of this state can do what he here asserts, "it logically follows that the protection of the Fourteenth Amendment is a matter of favor only, depending on the whim of the Governor, and not an absolute right."

 We agree with Judge Nuessle, then District Judge, now Justice of the Supreme Court of North Dakota, in the views expressed by him when, granting an injunction restraining the Governor of North Dakota, acting as the chief executive, and commander in chief of the military forces of the state, from taking over and operating coal mines in that state upon the grounds of public shortage and necessity, he said: "It is not so material that this court shall pass upon the propriety of the executive declaring martial law. As I read the authorities there is no occasion for martial law unless the courts themselves have been so incapacitated by reason of the circumstances existing and calling forth a declaration of martial law, that they are unable to function. The reason for martial law is the necessity to rehabilitate the courts, not to destroy them or usurp their powers. Bruce." The Non-Partisan League, pp. 134 to 139. Writ of prohibition and injunction denied by a divided court in State ex rel. Governor Fraser v. Nuessle, D. J.[3]

 We have found no case, we have been cited to none, supporting a view, the contrary of that which we take here, that under a Constitution like ours a Governor may by proclamation bring about a state of war. It is true that some of the decisions in their generalizations lend color to this view. An analysis of the decisions will show, however, that that color is spurious. The confusion with which the subject under investigation

by us is invested has arisen, not from what has been decided in cases, but from what has been said in them, from an attempt to follow, not stare decisis, but stare dictis. None of the so-called martial law cases cited to us, and only two that we have found, State ex rel. Governor Fraser v. Nuessle, supra, and Dakota Coal Co. v. Fraser (D. C.) 283 F. 415, temporary injunction granted, declared moot and reversed in (C. C. A.) 267 F. 130, 133, have dealt with a situation even remotely resembling the one involved. Therefore none are authority for our views, except as the general principles asserted in them furnish analogies for our course.

In the examination which we have made of them, we have found that, however they may differ in argument and result, one general principle runs through them from the Borden Case to the Lavinder Case, that dire necessity and dire necessity alone, the necessity of self-defense, suspends ordinary constitutional guaranties, and that, where that necessity does not in fact exist, no such suspension occurs.

In West Virginia, whose cases are most strongly relied upon by the defendants, Judge Poffenbarger in State ex rel. Mays v. Brown, 71 W. Va. 519, 77 S. E. 243, 244. 45 L. R. A. (N. S.) 997, Ann. Cas. 1914C, 1, and in Ex parte Lavinder, makes this crystal clear. In the first case, which was a case involving long-continued, desperate, and dangerous violence and disturbance, he declares: "It is said, also, that the proclamation of martial law ousts or suspends the civil jurisdictions. These expressions are hardly accurate. The invasion or insurrection sets aside, suspends, and nullifies the actual operation of the Constitution and laws. The proclamation of martial law simply recognizes the status or condition of things resulting from the invasion or insurrection, and declares it."

In the second case, although in West Virginia, the Governor by statute has the power to declare a state of war. Cf. State ex rel. Mays v. Brown. Judge Poffenbarger, on the authority of the Milligan Case, refused to permit proclamation to take the place of fact, saying: "The substitution of military for the civil law in any community is an extreme measure. Socially, economically, and politically, it is deplorable and calamitous. Its sole justification is the failure of the civil law fully to operate and function, for the time being, by reason of the paralysis or overthrow of its agencies, in consequence of an insurrection, invasion, or

---

[3] No opinion filed.

other enterprise hostile to the state, and resulting in actual warfare. * * * It is perfectly manifest that the proclamation of war did not, ipso facto, * * * inaugurate martial law in Mingo county. The Governor's attempt to inaugurate it and put it into effect in that county, in the manner hereinbefore described, was clearly futile and inoperative."

In none of the state cases on which defendants rely was there any theoretical, there was serious, in some of them desperate and prolonged, riot, destruction of property, and carnage. The decision of the court in each instance was based upon the existence of those facts, and the language of the opinions must be read in that light.

The federal cases cited by them, none of which, except the Wolters Case, are Texas cases, may be briefly disposed of.

Luther v. Borden arose before the passage of the Fourteenth Amendment. It was a damage suit involving an arrest made, during the rebellion and civil war in Rhode Island, under the authority of an act of the Legislature declaring martial law, and directing the taking of extreme action. The two Moyer Cases were civil rights cases. They did not decide, the Supreme Court of Colorado did not decide, that the Governor of Colorado had authority to declare martial law. United States v. Adams (D. C.) 26 F.(2d) 143. "We therefore reach the conclusion that, independent of the questions of the authority of the Governor to declare martial law * * * the petitioner, on the showing made by the return, is not illegally restrained of his liberty." In re Moyer, 35 Colo. 159, 85 P. 190, 194, 12 L. R. A. (N. S.) 979, 117 Am. St. Rep. 189. They decided merely that the Supreme Court of Colorado, having found Moyer's arrest lawful under the laws of that state, and the petition not negativing the good faith of the arrest or showing abuse of power, no lack of due process, no deprivation of civil rights, was made out by him.

The Fischer Case (D. C.) 280 F. 208, 210, was disposed of on the assertion, as to the correctness of which no state authority was cited, but which we accept, that, under the laws of the state of Nebraska, the Governor had the power to declare a state of war and initiate martial law in that territory. If these assumptions as to the law of Nebraska are sound, plaintiff was not deprived of his civil rights.

The Wolters Case (D. C.) 268 F. 69, 70, another civil rights case, was on a petition for writ of habeas corpus, opinion by Judge Rufus Foster of Louisiana, while sitting in the Southern District of Texas, for release from imprisonment in default of payment of fine imposed by a military court set up in Galveston after martial law had been proclaimed, some of the civil magistrates had been removed from office, and a military court set up in their stead.

In this case the relator conceded away the point at issue here, whether the Governor could, by proclamation, declare martial law. On page 71 of 268 F., the court said: "I must conclude that the Governor had complete authority to institute martial law in the city of Galveston. That is conceded by the relator." From that erroneous conclusion, induced, certainly aided by the concession, the learned judge proceeded to conclude that the Governor could do anything necessary to make his proclamation effective. That case correctly decided that the question whether there was riot or insurrection or breach of the peace and whether troops shall be called out is solely for the Governor, that the courts will not interfere with his discretion in that regard and will not inquire whether or not the facts justify it. It incorrectly assumed in the Governor, in addition to that unquestioned power, the existence of the stupendous one asserted here, the power to, by proclamation, set aside the laws and institute a military government in place of a civil, a power not only not granted, but forbidden to the Governor of Texas by its Constitution.

Upon a consideration of the whole case we hold not that we may, or that we do, inquire into the propriety of the Governor's calling out the troops to enforce the law, but that they were called out to act as civil officers, with no greater power than civil officers would have, that in their actions they are amenable to inquiry, as civil officers are, in their actions, and that neither the proclamation of martial law, nor the purported military character of the actions, constitutes any defense to plaintiffs' suit. That defendants Jacob F. Wolters, R. S. Sterling and W. W. Sterling have been without warrant of law interfering with and illegally depriving plaintiffs of their undoubted right to operate their own properties in a prudent and reasonable way, and in accordance with the laws of the state, and that, from further interference, pending the final disposition of this suit, they must be enjoined.

It does not follow, however, that plaintiffs may have their injunction without terms. For though the pursuit of the ignis fatuus, martial law, with its claims of military necessity and action in extremis has caused all parties to this suit to lose sight of the real, the fundamental, facts which the pleadings and the evidence present, and of which we may take judicial knowledge (Henderson v. Comm., 56 F.(2d) 218), we may not do so. These facts are that the East Texas oil field is of great extent, and, if proper measures are taken to safeguard against waste of oil and gas stored there, it has enormous production potentialities. That it is the concensus of informed opinion, with which plaintiffs do not disagree, that the general operation of wells in that field to their full capacity would result in actual physical waste of oil and gas, and injury to the strata in which it is confined. That before the taking over by the Governor, upon the ground of military necessity, of the wells in the field, the railroad commission, the statutory agent of the state for the administration of its conservation laws, had undertaken the duty of and was determining the amount of oil which might be taken daily without waste, and, but for the action of the Governor in ousting it from the exercise of its jurisdiction, it would still be doing so.

We have held in MacMillan v. Comm., 51 F.(2d) 400, and Henderson v. Comm., 56 F.(2d) 218, that the state of Texas has the power to conserve its resources of oil and gas, and prohibit the waste thereof. That the commission is the body charged with the administration of those laws, and that its orders, issued in pursuance thereof, are prima facie valid. This case began with a complaint against the commission's orders, as to which no evidence has been offered.

It is true that the orders of the commission have expired, and that we are without the guidance of their findings under present conditions as to what may be safely taken without waste. Nor is there any evidence before us upon which we could form a conclusion of our own as to what amount of oil might safely, without violation of the statutes' prohibition against waste, be produced from plaintiffs' wells.

We may not therefore, in view of the attitude which the plaintiffs and the commission have taken in this cause in not pressing the issue between them, at this time make any decision on that issue or grant any relief as to the commission. In this situation, we are disposed to authorize a decree enjoining the defendants, the two Sterlings and Wolters, from enforcing against plaintiffs any of their so-called military orders already passed or to be passed, regulating or restricting the production from their wells, and from in any manner interfering with the lawful production of oil from plaintiffs' property, conditioned upon the plaintiffs before opening their wells to produce more than their neighbors are now content without complaint of oppression to produce, making a showing as to what amount of oil can be reasonably taken therefrom per day; or preferably, upon the condition that, pending a further hearing of the controversy between the plaintiffs and the commission as to the right of the commission to limit their production, plaintiffs produce no more oil than that which, upon a specific and precise examination of their wells, and a finding under the statutes prohibiting waste, the commission finds the wells may produce without the waste prohibited by law.

A decree prepared in accordance with these views may be presented to the District Judge for settlement within fifteen days.